## ROCKWELL *vs.* SAUNDERS and PULLING.

19b 473
51ad349

On the appointment of an adminstrator the personal property of the intestate vests in him, by relation, from the death of the intestate.

An administrator may bring trespass, for unlawfully taking goods of the intestate after his death and before administration granted. He may also maintain an action for a trespass committed on the real estate, or for taking and carrying away the goods, of the intestate in his lifetime.

In an action of replevin (or to recover the possession of personal property,) the plaintiff cannot recover if it appears that the property belonged to a person deceased, and that letters of administration have been issued, and the plaintiff has taken possession wrongfully.

The plaintiff, to maintain the action, must have the general or special property, and the right to possession. He must be the owner, or lawfully entitled to the possession of the property by virtue of a special property therein.

Rockwell *v.* Saunders.

No title will be acquired by the purchaser of logs from one who is in possession of land as assignee of a vendee, under a contract which prohibited the latter from cutting timber until he had made certain payments, which he has not made; although the purchaser of the logs did not know what title the occupant had, to the land.

If such purchaser of the logs saws them into lumber, in good faith, and without notice, whether he will acquire title to the lumber?   *Quære.*

Where the property has been replevied, and delivered to the plaintiff, he cannot elect to take judgment for the value.

*Semble,* that where the property has not been delivered to the plaintiff, and he recovers, the judgment should be in the alternative.

THREE suits in replevin (or for the delivery of personal property) brought in February, 1852, to recover 16,000 hemlock boards, were consolidated by stipulation ; and were tried before Mr. Justice CADY, at the Saratoga circuit, in October, 1852. The logs, from which the timber was sawed, came from a lot in Kayaderosseras patent, to which George W. Bancker, at the time of his death, had title, (unless it had passed by a sheriff's sale hereafter mentioned.)   One Ralph testified, that he went on to the lot in 1833, and occupied it till May, 1850, and left his "things" there till September, 1850:   That when he went into possession, he expected G. W. Bancker owned it, and supposed so until May, 1844.   That when he went on to it he had a quitclaim deed from one Judson, under which he occupied until he took a contract from Bancker.   That he cleared about ten acres, and there was a log house and barn on it when he left it.   It was proved that on the 9th of May, 1848, he and G. W. Bancker entered into a contract by which Bancker agreed to sell the land to him upon his paying $2 per acre, and he was to pay $50 on the 15th of June, 1848.   By the terms of the contract he was not to destroy or sell any timber until he had made the first payment and Bancker had ascertained the true quantity of acres, which would be as soon as Ralph made the first payment. There were over 240 acres of the land agreed to be conveyed ; and after the first payment, Ralph was to pay $50 annually and interest.   There was nothing in the contract in relation to possession.   Ralph further testified that he never made the first payment, and in May, 1850, sold to N. N. Houghton.   In May,

Rockwell *v.* Saunders.

1844, or 5, John Brotherson came to his house on the lot, and claimed to own the lot, and said he had a good deed from the Banckers. Ralph doubted, but on his coming again, gave him an agreement to pay rent one year; but he refused to pay when Brotherson came again, and Brotherson threatened to put him off; but he refused to go, and afterwards made the contract with Bancker.

Houghton testified that he purchased the contract between Ralph and Bancker; that he took a quitclaim deed from Ralph, and his contract. That he gave a quitclaim deed to J. P. Conkling, to whom he showed the contract between Ralph and Bancker, who handed it back to him. That Conkling was the son of Col. Conkling, to whom the deed was delivered, in the presence of his son. That witness had the contract about a month in his possession. That Ralph told him where the key was and he went up and gave Conkling permission to go on to the lot. That he got $170 for the lot. That he did not offer to pay up the contract. He was told there was a lawsuit about it, and he would get no title.

H. T. Jenkins testified that the logs (from which it appeared the lumber in question was made) were taken from this lot in the winter of 1850 and 1851, and in the spring of 1851, by said H. T. Jenkins and his brother, by order of Col. Conkling. That the plaintiffs were to pay Conkling for the logs, of which there were 1100, and they finished drawing in the latter part of March. That the witness and his brother were to take the logs of Col. Conkling and were to get them into a mill called Effner's mill, and pay Conkling for them, $10 per hundred. They to have all that came from the logs except $10. That the witness and his brother sold them to the plaintiffs in the winter of 1850, and to be delivered in the river in the first place; and the witness and his brother then consented to deliver them at Effner's mill, at $32.50 per hundred; $10 of which was to be paid to Conkling, and the rest to the Jenkinses, who drew their pay while at work. One Effner testified that he sawed the logs for the plaintiffs, in the winter and spring of 1851. That the agreement to saw, was made with the plaintiffs

in 1850, and the logs all drawn by Jenkins by the last of March or first of April 1851, and all sawed as soon as May or June of that year; and were drawn away in the winter of 1852. That when he made this contract for sawing, it was to saw the logs the Jenkinses were then delivering, and he understood the logs were to come from the Ralph lot. It was further proved that a large quantity of the lumber was drawn away by the defendants to Saratoga Springs, to be there shipped by rail road to Troy. Some of it was taken by them from Effner's mill yard, and some from a place to which the plaintiffs had drawn it. A witness also stated that the plaintiffs said " they had the logs from Jenkins, or he got them in for them."

G. W. Bancker died in March 1851, and Evart A. Bancker was his heir at law; and one McGregor became the administrator of the former. In November, 1851, E. A. Bancker offered a deed to Col. Conkling, who refused to take it or make payment; and on the 13th of November, 1851, Bancker gave a deed of the lot to the defendant Pulling; which included, in terms, all the logs and timber lying on the lot. On the 22d of November, 1851, Pulling sold an undivided moiety of the lot to the defendant Saunders. The defendants offered in evidence a memorandum of sale, including the logs, boards, lumber &c. in question, purporting to be from E. A. Bancker, by his attorney, to the defendants, dated November 13th, 1851; but no proof of his authority was given, and the memorandum was rejected, and the defendants excepted. The defendants obtained leave to amend their answer so as to set up title to the property in the administrator of G. W. Bancker. The defendants offered in evidence a bill of sale, dated October 2d, 1852, and duly acknowledged, from said administrator to the defendants, of the logs and boards &c. made from trees taken from the land of G. W. Bancker contracted by him to be sold to Ralph. This was objected to, and rejected by the court, and defendants excepted. The plaintiffs gave in evidence a judgment for costs, against G. W. and E. A. Bancker in an ejectment suit for lands in the county of Fulton, brought by the Banckers against two persons by the name of McNiel, filed February 13th, 1845;

Rockwell *v.* Saunders.

(but there was no evidence that it was docketed in Saratoga county ;) and an execution thereon to the sheriff of the county of Saratoga ; and proved a sale of this lot in August, 1846, to one Robert Whillis ; and a deed to him by the sheriff. The defendants objected to this evidence, that the judgment had not been docketed in the county of Saratoga ; that no authority to commence the suit had been shown ; and that the defendants and those under whom they claimed are estopped from denying the title of the plaintiff. The court overruled the objection, and the defendants excepted. The defendants offered to show that the attorneys for the plaintiffs in that suit had no other authority, except that the father of John Brotherson, one of them, had power to commence suits, under a condition that he should pay all costs that might be adjudged against them ; and that J. Brotherson knew of the condition, and procured the execution to be issued and a sale to be made to Whillis as his agent and for his benefit ; all without the knowledge of the Banckers ; and that Bancker, when he heard of it, in May 1851, commenced a suit against J. Brotherson and his father for fraud in procuring such sale ; and a decree was entered in November, 1851, setting aside the sheriff's deed to Whillis, and requiring J. Brotherson to release all claim to the lot. This evidence was objected to and rejected, and the defendants excepted. J. Brotherson testified that he gave a lease to Ralph, in May, 1845, and that Ralph occupied under him until May 9th, 1848. The plaintiffs offered to prove the value of the lumber in Troy, in April, 1852. The defendants objected that the value must be taken. in January 1852, when the sheriff took the property in this suit, and at Saratoga Springs where it was admitted the property was replevied. The objection was overruled and the testimony received and the defendants excepted.

In the course of the trial, the defendants made proof of the title of G. W. Bancker to the land, by a descent from one of the original patentees.

The court charged the jury that Bancker had shown title to the lot, and that all persons coming into possession under the contract between Ralph and Bancker were estopped to deny

Bancker's title, and stood in the same situation as Ralph, and that the plaintiff, dealing with Conkling and Jenkins, would stand in the same situation as if dealing with Ralph. And that if Ralph had cut the logs and sold them to the plaintiff, G. W. Bancker could not maintain an action against the plaintiff for boards, but must be confined to his action against Ralph, if they believed the plaintiff purchased without knowing of Ralph's contract. That Bancker, by allowing Ralph to occupy the lot, held him out to the world as owner; and that Ralph's possession of the lot was evidence to all the world, except Bancker, of the true ownership; and that Ralph's possession was such that the plaintiffs had a right to regard him as owner; and that the plaintiffs had such right in dealing with Ralph for the logs. That the defendants could not show title out of the plaintiff; that they were not in a situation to do so. That, although the plaintiff's title might be defective, and the administrator's title relate back to the death of G. W. Bancker, still the defendants could not defend themselves against this action, because they had deprived the plaintiff of the possession of the property, and had shown no connection with the title of the administrators; that if the defendants should succeed in defeating this action, the plaintiff might be still liable to the administrators of Bancker for the value of the logs. That the defendants, having unlawfully taken the boards, must show the exact quantity taken, and it did not lie upon the plaintiff to show the quantity taken. The defendants excepted, and also asked the court to charge, that the plaintiff, in purchasing the logs, were bound to know under what title Ralph occupied; also that neither Ralph nor Conkling, or any other person, could acquire title to timber from the occupant, while the occupant held under the contract of Bancker with Ralph; also, that if Conkling cut the timber as a willful trespasser, and sold the same to the plaintiff for Jenkins, such sale did not divest Bancker, as owner, of his title to the timber, logs or boards; and that Bancker's title to the boards, so long as the latter could be identified as cut from the same logs, remained unimpaired; that by the production of the letters of administration the title to the boards was shown

to be out of the plaintiff; and that the plaintiff, to sustain his title, was bound to show that he purchased without knowledge of Ralph's rights, and that the burden of proof lay on the plaintiff. The court denied each of these requests as they were made respectively, and the defendants.excepted.

The jury found a verdict for plaintiff, and assessed the value of the property at $1350, for which sum and costs the plaintiff entered up judgment, and the defendants appealed.

*J. Sanders* and *J. Ellsworth*, for the defendants.

*W. A. Beach*, for the plaintiffs.

*By the Court*, HAND, P. J. It was admitted, upon the trial that the property had been replevied ;· and the demand is, for judgment against the defendants for the possession of the property, and that they be adjudged to pay to the plaintiff damages to the amount of $2000, and interest and costs ; and yet the judgment is for the value of the property as assessed by the jury. This is probably a mistake, but the record is clearly erroneous. It is said the court of appeals has decided, in a case not yet reported, that a judgment for the defendant, in the action of replevin, must, under the code, be in the alternative ; and probably the same rule will be held applicable to a judgment for the plaintiff. But if the property has been replevied and delivered to the plaintiff, he should not be permitted to elect to take judgment for the value.

If it had been competent for the plaintiffs to show title to the land out of Bancker, I think it would have been no answer that the deed to Whillis had been set aside after the logs had been taken from the lot; if taken by a *bona fide* purchaser from a *bona fide* purchaser at the sheriff's sale. And the judgment in favor of the McNiels, for costs, was valid as to them, and they had a right to issue an execution thereon. But if the attorney on the record, of Bancker, knew the terms of the agency, and that his father was to pay the costs, and yet procured execution to be issued, and the land to be sold for the sum of $30, and

conveyed for his own benefit and without giving information to Bancker, and in fraud of his rights, I do not see how he could set up that title as against his client. But the plaintiff showed no title derived from Brotherson or Whillis; and indeed, it would have been fatal to him to have shown title in a third person. Besides, Bancker was the source of the title they claim to set up. And it does not appear that Whillis ever interposed in the matter at all; nor does Brotherson pretend that Ralph held under him after the latter took a contract from Bancker on the 9th of May, 1848.

Under all the circumstances, therefore, the learned judge decided correctly, that Ralph and all persons holding under him were estopped from denying the title of Bancker. This they could not do, unless they could show imposition, or a misapprehension of the rights of the parties, in making the contract. (*Jackson* v. *Spear*, 7 *Wend.* 401. *Jackson* v. *Miller*, 6 *id.* 228.)

The defendants evidently had no title when they took the lumber, nor when the suit was commenced. Months before they obtained title to the land, the logs had been carried away and sawed into boards. The drawing of the logs was completed in the latter part of March, 1851, and probably they were all cut and drawn off the lot before the death of G. W. Bancker, and consequently, Evart A. Bancker, their grantor and the heir of G. W. B., never owned them. They became personal estate, by the severance. (2 *Seld.* 293. 2 *R. S.* 82, § 6. 4 *Bl.* 233. 2 *Russ. on Cr.* 63. 7 *Taunt.* 191.) If the logs and lumber were the property of George W. Bancker at his death, no one had a right to take them except his administrator; in whom, on his appointment, the property became vested by relation, from the instant of the death of his intestate. (*Toll. Ex.* 152. *Valentine* v. *Jackson*, 9 *Wend.* 302. *Babcock* v. *Booth*, 2 *Hill*, 184. *Priest* v. *Watkins*, *id.* 225. 2 *R. S.* 449, § 17. *Id.* 81, § 69. 18 *Vin.* 285. *Morgan* v. *Thomas*, 8 *Exch.* 302. *Foster* v. *Bates*, 12 *M. & W.* 225. *Tharpe* v. *Stallwood*, 5 *M. & G.* 760.) And he may bring trespass for unlawfully taking the goods of the intestate after his death and before administration granted, or trover for their conversion. (*Id.*) In

Rockwell *v.* Saunders.

*Tharpe* v. *Stallwood,* the subject was thoroughly discussed. And an administrator may also maintain an action for a trespass committed on the real estate, or for taking and carrying away the goods of the intestate in his lifetime. (2 *R. S.* 114, § 4, 5. *Id.* 447, § 1. *And see* 1 *Saund. R.* 217, *n. b, f, 6th ed.*) Though the administrator could not bring trespass for an injury to the freehold at common law. (*Emerson* v. *Emerson,* 1 *Ventr.* 187 ; *S. C.* 11 *Vin.* 127. *Toll. Ex.* 160, 436. *And see* 4 *Co.* 62, 3 ; 11 *id.* 82.)

If the title to the property was in the administrator of Bancker, the plaintiffs must fail. The pleadings were amended so as to allow the defendants to show title in the administrator. That title has no relation back, so as to take away any vested right, or make one a trespasser by relation, where the act complained of was lawful at the time. (*Tharpe* v. *Stallwood, supra.*) But if the plaintiffs had no legal title or lawful possession, but had taken possession wrongfully, as soon as administration was granted, their possession became tortious *ab initio.* And it is sufficient for the defense, that the property was in the administrator. Property in a stranger has always been a good plea in replevin without connecting the defendant with such title. (*Ingraham* v. *Hammond,* 1 *Hill,* 353, *and the cases there cited. Anstice* v. *Holmes,* 3 *Den.* 244. *McKnight* v. *Dunlop,* 4 . *Barb.* 41) If the judge who delivered the opinion in *Rogers* v. *Arnold,* (12 *Wend.* 30,) intended to lay down a different rule, the *dictum* was not only *obiter,* but I believe is not supported by a single reported case. (*Presgrave* v. *Saund,* 1 *Salk.* 5. *S. C. Holt,* 562. *Butcher* v. *Porter,* 1 *Salk.* 94. *Wildman* v. *North,* 2 *Lev.* 92. *Bacon's case,* Cro. *Eliz.* 475.) The title of the plaintiff is in issue ; and he must have the general or a special property and a right to possession. (*Pattison* v. *Adams,* 7 *Hill,* 126. *Chancellor, in Miller* v. *Adsit,* 16 *Wend.* 344. *Harrison* v. *McIntosh,* 1 *John.* 380. . *Co. Litt.* 145 *b.* 1 *Ch. Pl.* 146. 2 *Sel. N. P.* 364. *Wilk. on Rep.* 48. *Code,* § 207.) The anonymous action given by the code to recover the possession of personal property, is in this respect substantially what the action of replevin was under the revised statutes. He

must be the owner, or lawfully entitled to the possession by virtue of a special property therein, in order to obtain delivery (*Code* § 207.)

Had the plaintiff, as against Bancker or his administrator, the general or special property ?

The logs were probably all cut and drawn in the lifetime of Bancker.    His contract with Ralph did not, in terms, authorize the latter even to occupy the lot.    And it expressly prohibited him from cutting timber, &c. except upon a condition which was never fulfilled.    Such prohibition was unnecessary, for a contract to convey gives no license to cut the timber.    (*Suffern* v. *Townsend,* 9 *John.* 35.    *Cooper* v. *Stower, Id.* 331.    *Mooers* v. *Wait,* 3 *Wend.* 104.)    And Bancker, and after his death his administrator, could have trespass *quare clausum fregit* against Ralph or any one under him for cutting the timber, in his lifetime. (*Suffern* v. *Townsend, supra.    Cooper* v. *Stower, supra.*  2 *R. S.* 114, § 4, 5.)    And the trespasser would obtain no title to the property cut and carried away.    Nor could he convey any as against Bancker or his representative, at least while the property remained in specie and could be identified. In *Mooers* v. *Wait,* the vendee and lessee sold standing trees to A. who cut them into logs and removed and sold them to the defendant, who was held liable in trover for the logs.    In *Farrant* v. *Thompson,* (5 *B. & Ald.* 826,) fixtures were severed by the tenant and sold on an execution against him, and trover was sustained against the purchaser.    (*And see Higginson* v. *York,* 5 *Mass. R.* 341.    *Hoffman* v. *Carow,* 22 *Wend.* 294. *Williams* v. *Chapin,* 11 *Id.* 80.    2 *Saund. R.* 47 *b, n. g. Dyer* v. *Pearson,* 3 *B. & C.* 42.    *Loeschman* v. *Machin,* 2 *Stark. R.* 311.)    The charge therefore, that Bancker was confined to his action against Ralph, if the plaintiff purchased without knowing of his contract, was erroneous.    Indeed, that rule can hardly apply to real estate, although, for some purposes possession is *prima facie* evidence of title as against a wrongdoer.    (*Smith* v. *Lorillard,* 10 *John.* 339.    *Jackson* v. *Harder,* 4 *id.* 202.)    The mode of conveyance of real property in

Rockwell *v.* Saunders.

connection with our system of registry gives great facilities for ascertaining the true owner. (*See* 2 *Hill. on Mortgages,* 213.)

But it is contended that if the plaintiffs purchased the logs in good faith, and paid for and sawed them into boards, in the belief that the person of whom they purchased was the owner, they are at most, only liable to the real owner for the value of the logs ; and by this accession, and alteration of the article, they have acquired title to the property in its present state ; especially, unless they took the logs from the lot. In *Farrant* v. *Thompson, supra,* the defendant must have had knowledge of, and in a measure, probably, was accessary to, the original severance. The property was demanded while still in logs, in *Mooers* v. *Wait, supra.* In *Brown* v. *Sax,* (7 *Cow.* 95.) *Betts* v. *Lee,* (5 *John.* 348;) *and Curtis* v. *Groat,* (6 *id.* 168,) the labor was bestowed by the wrongdoers. And in *Silsbury* v. *McCoon,* (3 *Comst.* 379,) the distinction between an innocent holder and a wrongdoer, was recognized and enforced. I had supposed however, that the change in the article in such cases in its shape, or nature, must be so complete that the property could not well be identified ; or it must be changed from person- ality into realty ; as grapes into wine, olives into oil, grain into whiskey or malt, or timber into a house, &c., or that the original be comparatively of little value. And that felling and hewing trees into timber, or making logs into boards, &c. was not suffi- cient alone to divest the true owner of his title. ( *Year book,* 5 *H.* 7, *fol.* 15, *Betts* v. *Lee, supra. Baker* v. *Wheeler,* 8 *Wend.* 505. *Anon. Moor's R.* 20. 18 *Vin.* 69. *See Putnam* v. *Ritchie,* 6 *Paige,* 390. *Domat, p.* 1, *b.* 3, *T.* 7, §2, *art.* 15.) And that, though altered in form, if what remains is the prin- cipal part of the substance, the title is unchanged, and the prop- erty will not be divested by a purchase from one having no title. (*Moor,* 22. *And see Ely* v. *Ehle,* 3 *Comst.* 506 ; *Mor- gan* v. *Varick,* 8 *Wend.* 587.) However, I understand my brethren think that if the plaintiffs did not take the logs from the land, but purchased them in good faith, and sawed them into lumber, believing they were their own property, the defendants had no right to take the property from them. And, perhaps

since the case of *Silsbury* v. *McCoon*, where the form is changed and the value is materially enhanced by the labor of the possessor, the criterion is, whether it was due in good faith, rather than whether the property can be identified. But however that may be, we agree that there must be a new trial, for the reasons already stated.

Judgment reversed and new trial ordered, with costs to abide the event.

[FRANKLIN GENERAL TERM, September 4, 1854. *Hand, Cady, C. L. Allen* and *James*, Justices.]