Hecker *v.* New York Balance Dock Company.

Judgment for the defendants.

[NEW YORK SPECIAL TERM, April 24, 1857. *Davies*, Justice.]

————∘∘∘————

JOHN HECKER and G. V. HECKER *vs.* THE NEW YORK BALANCE DOCK COMPANY.

ROBERTS *vs.* THE SAME.

The corporation of the city of New York, by its charter and the powers conferred upon it by the legislature, has the right to regulate the uses of the basins and slips in the city; and its regulations are binding upon all, provided they do not interfere with the rights of the owners to receive and collect their wharfage.

Subject to this right, the corporation may direct the use of any particular slip or wharf to be appropriated exclusively for any particular craft or class of vessels; and in reference to its own wharves and piers, may grant the exclusive use to any person, for any particular craft or class of vessels, and may do the same, with the consent of those entitled to wharfage, in reference to any basin, slip or pier.

The general authority of the state and city governments, in reference to the locating of ships and vessels, and the uses of the wharves, piers and slips, is exercised through the dock masters, as to the public or corporation basins, piers and wharves, and through the harbor master, as to private basins, piers and wharves.

The jurisdiction of those public officers is co-extensive with every legal and legitimate use of the basins, piers and wharves.

The occupation of basins and slips by a balance dock, for the repairing of vessels, is an occupation for a lawful and legitimate commercial purpose; and if sanctioned by the proper officers, and assented to by the owners of the piers and bulkheads, and under lease from those who are entitled to collect and receive the wharfage and cranage from the premises occupied, no other person has a right to complain of such occupation, or to restrain the same by injunction.

MOTION to dissolve injunctions. The opinion sets forth the material facts.

*D. D. Field*, for the plaintiffs.

*S. J. Tilden*, for the defendants.

Hecker *v.* New York Balance Dock Company.

DAVIES, J.   This is a motion on the part of the defendants in each of the above entitled causes for a dissolution of the injunction order heretofore granted therein.   The motions have been argued after most ample preparation by the counsel, and with eminent ability.   The grave and important considerations connected with the subject, and the influence the decision to be given must necessarily have upon the rights of the parties, demanded this careful consideration, and the labors of the court have been greatly aided by this enlarged discussion.

The plaintiffs complain that the use by the defendants of their floating dock for the reparation of ships and vessels, of the slips on the East river, between piers 40 and 41, and 41 and 42, is an interruption to their business, and allege that the use of those slips for boats, or craft, to supply the mills of the one, and the store of the other, is convenient, and the occupation thereof by the defendants for the purpose aforesaid, subjects them to expense and inconvenience.   The plaintiffs in the first suit own no property fronting or adjoining the East river; the plaintiff in the second owns a store fronting on South street, and near the premises occupied .by the defendants, but not opposite thereto.   The plaintiffs are not the owners of the piers or bulkheads, nor have they any interest therein, nor are they entitled to collect any wharfage thereon.   They are not interrupted in the enjoyment of any property belonging to them, but they complain that the occupation of the defendants prevents their using the property of others, in such manner as they deem most fit, convenient and appropriate.   The defendants' use and occupation is with the consent of the true owners of the piers and bulkheads, and under lease from those who are entitled to collect and receive the wharfage and cranage from the premises thus occupied.   Can the plaintiffs object to such occupancy, on the ground that it would be more convenient to them, and more advantageous to their business, that these slips should be reserved for the use of such craft or vessels as they may have occasion to use and employ?

By section 7 of the Dongan charter, confirmed by the Montgomerie charter, power is given to the common council of the

city of New York to make such laws, orders, ordinances and constitutions as to them shall seem necessary and convenient for the good rule, oversight, correction and government of the said city and liberties of the service, and of all the officers thereof, and for the several tradesmen, victuallers, artificers, and all other the people and inhabitants of the said city. Power is also given, to enforce obedience to such by-laws, ordinances, &c. by fines and amercements against all persons offending against the same. By section 2 of the Montgomerie charter, the jurisdiction of the city of New York extends to and embraces the East river and Sound, to low water mark on the Long Island shore. The proprietors of land on the East river were bounded in their original grant by high water mark; and by section 3 of the Dongan charter, there was granted to the corporation of New York all the land around the island to low water mark. This grant was confirmed by the Montgomerie charter; and by section 38 of the last mentioned charter, there was, in addition, granted to the corporation the soil under water extending 400 feet beyond low water mark into the East river. These grants have been held by the highest court in this state as vesting the absolute ownership of the soil under water from high water mark, to 400 feet beyond low water mark, in the corporation, with full power to sell the same, and to make and erect streets thereon, without the consent of the owner of the adjoining land at high water mark, and thereby entirely excluding and cutting him off from access to the water. (*Furman's case*, 5 *Sand.* 16, affirmed in the court of appeals. *Gould* v. *Hudson River Rail Road Company*, 2 *Selden*, 522.)

The corporation had authority given them by this section of the charter, in reference to the land thus granted, to fill, make up, wharf and lay out every part thereof; and the only limitation upon their use of the same in any manner they might think fit was, that they should not wharf out before any persons who might have prior grants, of quays or wharves beyond low water mark, without the actual agreement or consent of such persons, owners of such quays and wharves. Section 7, of the act of April 3d, 1798, (*Davies' Laws*, p. 399,) provides that

no building of any kind or description whatever, other than piers and bridges, shall at any time thereafter be erected upon said streets or wharves, or between them, respectively, and the rivers to which they respectively front and adjoin. By the last mentioned act, the corporation were authorized to adopt a permanent plan for the improvement of the city on each river, by laying out an exterior street thereon, and the same was to be constructed by and at the expense of the proprietors of the land adjoining or nearest and opposite to said streets or wharf in proportion to the breadth of their several lots. If said proprietors should neglect or refuse to build said streets, and fill up the intermediate spaces, then the same might be done by the corporation at their expense, and the amount so expended might be recovered of said proprietors. By section 5 of said act, it was made lawful for the corporation to direct piers to be sunk and completed at such places and in such manner as they might think proper, in front of said streets and wharves, and to be connected with the same by bridges, at the expense of the propietors of lots lying opposite to the places where such piers shall be directed to be sunk, and it was further provided that if such proprietors should refuse or neglect to sink or make said piers, then it might be lawful for the corporation to do so at its own expense, and receive to their own use wharfage for all vessels that might at any time be at, or be fastened to, said piers and bridges. By the 3d section of the act of April 2, 1806, (*Davies' Laws, p.* 425,) it is provided that in case any person who, according to the provisions of the act before referred to, shall have neglected to sink or complete piers or bridges, in conformity with the directions of the corporation, it may be lawful for the corporation to grant the right of making such piers and bridges, and the right of receiving the profits thereof, to any person or persons, in fee or otherwise.

The defendants in this case are the lessees of the owners of the several piers, bridges and bulkheads occupied by them, and their occupation is by and with the consent of such owners and persons entitled to the wharfage and cranage. These charges are regulated by the act of 31st March, 1801. (*Davies' Law*

Hecker *v.* New York Balance Dock Company.

*p.* 400.) Assuming that the occupation of the defendants is not a public nuisance, it must be regarded, I think, as quite clear that the corporation, by its charter and the powers conferred upon it by the legislature of the state, have the right to regulate the uses of the basins and slips in the city, and that their regulations are binding upon all, provided they do not interfere with the rights of the owners to receive and collect their wharfage. Subject to this right, it appears to me quite clear, that the corporation may direct the use of any particular slip or wharf to be appropiated exclusively for any particular craft or class of vessels; and in reference to their own wharves and piers, may grant the exclusive use to any person, for any particular craft or class of vessels, and may do the same, with the consent of those entitled to the wharfage, in reference to any basin, slip or pier.

The state legislature have conferred upon the corporation the general authority to enact ordinances regulating the manner of the public uses of the basins, piers and wharves of the city for all lawful and legitimate commercial purposes. (All the city charters; *Kent's Notes, pp.* 134 *and* 176, where the various statutes are said to be merely auxiliary to the charters; 2 *R. L. p.* 463, § 236; *Davies' Laws, p.* 559; *Act of April* 16, 1830, *L. ch.* 222; *Davies' Laws, p.* 705.)

The statute of 1813 applies as well to private as corporation or public slips. (*Vandewater* v. *City of New York,* 2 *Sand.* 259.) Under this general power, the common council has always had and exercised the power to pass ordinances regulating the uses of the basins, piers and wharves, and classifying the various kinds of business and distributing these classes to particular basins, piers and wharves. (*Vandewater* v. *City of New York, sup.*) But the act of April 16, 1830, must remove all doubts as to the authority of the corporation to assign exclusively piers and slips and basins to any particular class of business, or exclusively to any particular person. This act has been construed to add the authority to create exclusive privileges in favor of particular individuals, of the same class, as for instance, lines of steamers and packets, or ships of a par-

ticular house; such authority being absolute as to the corpora- tion or public wharves, piers and slips; and as to private wharves, piers and slips, conditional on the assent of the own- ers or those entitled to the wharfage. This has been for years the constant usage of the corporation, and seems essential to the commercial wants of this port. It is recognized and sanc- tioned by the case in 2 *Sand.* 259. This general authority of the state and city government in reference to the locating of ships and vessels, and the uses of the wharves, piers and slips, is exercised through the dock masters as to the public or cor- poration basins, piers and wharves, and through the harbor master as to private basins, piers and wharves. That authori- ty has not been limited or precisely defined by statute, but is comprehensive and must be construed as extending to all forms of police regulation.

In reference to the power of the harbor masters, the act of March 16, 1850, (*Davies' Laws, p.* 994, § 3,) substantially re- enacts a series of statutes, commencing as early as that of April 1, 1796, (3 *Greenl.* 317,) and is in the exact language of the re- vision of 1813. It is declaratory as to the duties and authority of the harbor master, and recognizes the power of that officer. They are to " station and regulate all ships and vessels," wheth- er lading or unlading, or whether waiting for freight or laying up for the winter, &c., and, in general terms, to station and regulate all ships and vessels in the stream of the East or North river, within the limits of the city of New York, and the wharves thereof; this jurisdiction being co-extensive with every possible commercial use of any ship or vessel; to remove, from time to time, any ship or vessel not employed in receiving or discharging cargo, to make room for and to accommodate others requiring room to receive and discharge their cargo; and such directions are to be enforced, under a penalty of $50. In practice, the power of removal, which is expressed in more restricted terms than the other, has been held to apply to all ships and vessels, under all circumstances. (*Adams* v. *Farmer,* 1 *E. D. Smith,* 588.) This statute gives the harbor master, by virtue of the words " ship, or vessel," jurisdiction of every

"structure intended to float upon the water," in the private basins or at the private piers and wharves. (*Adams* v. *Farmer, Id.* 588.) The same rule and the same authority apply to and are devolved upon the dock masters of the corporation, in reference to the public or corporation slips, piers or wharves. There cannot, I think, be any doubt that the jurisdiction of these public officers (whether harbor masters or dock masters) is co-extensive with every legal and legitimate use of the basins, piers and wharves. It is manifest that this view is correct, from the authority of the case of *Decker* v. *Jaques,* (1 *E. D. Smith,* 80.) There it was said that the same words, "ship and vessel," in the statute giving wharfage, have been held to include even an oyster boat made square and boarded up at each end, and employed as a mere receiving vessel, not being used or capable of being used, in navigation, or indeed of being employed in any use, properly or legitimately commercial, as connected with or necessary to navigation.

These views will be strengthened by reference to the practice of the harbor masters and the dock masters, and the rules and regulations applicable to them. The harbor masters have adopted and published a minute code of regulations as applicable to vessels, their places of mooring, lights, position, rigging, their points of accommodation in certain cases, and many other subjects. (*Haskett's Abstract of the Laws of Vessels, Wharves, &c. p.* 28.) The ordinance of the common council, providing for the appointment of the dock master, declares the purpose to be "the direction of the removal and disposition of vessels," "and the removal and disposition of vessels," and the authority conferred upon him is "to give such advice and direction from time to time, as" he "shall think just and proper," "touching the *laying,* fastening and *berth* of any such sloop, boat, or other vessel whatever." The word "disposition" clearly implies arrangement or classification, and it clearly imports authority to give those orders and directions upon a plan or system. (*Corp. Ord.* 1845, *ch.* 34, *title* 2, § 1, *p.* 333, *and* § 12, *p.* 336.) The dock master has also the authority to allow vessels out of employ, to lay up in any corpo-

ration or public slip. It is thus seen that these officers have by immemorial usage, exercised the authority for promoting public convenience and increasing the accommodations for ships and vessels, and calssifying them in their use of the basins, piers and wharves, by habitually sending large ships to basins having deep water, and small vessels to slips having shallow water; distributing them also, according to the locations for business, and generally so arranging the use of the basins and slips as, in their judgment, would best promote the general convenience. There cannot, I think, be any doubt that the acts of these officers, though they may sometimes amount to a continuous occupation of the particular basin for a particular use—in fact, to a practical appropriation of it for the time being to a particular class of vessels—are clearly within the legal competency of these officers, and are not only not illegal, but unobjectionable and promotive of the commercial advantage and prosperity.

It is then, I think, clearly and satisfactorily apparent that the occupation of the defendants, if legal, for the purpose designed by them, is, in all other respets, in accordance with the charter of the city, the laws of the state, and the ordinances of the common council, and is with the express sanction of the proper officer, charged with the duties of seeing that they are all properly executed. So far as they can give consent or authority to the defendants for such occupation, they have it in the most ample manner.

But it is objected, on the part of the plaintiffs, that such use of the basins, piers and slips is not for a lawful and legitimate commercial purpose, and that no consent or authority can be given for their occupancy for any other purpose. Conceding this to be so, the inquiry remains : Is the use to which the defendants have devoted those slips, piers and basins, lawful and legitimate? It seems to me that the loading and discharging vessels of their cargoes is not the only legitimate commercial use of a pier, slip or basin, but one of many uses; among others, that of waiting for freight, the laying up of a ship or steamer, while not employed in winter, or at any other time, the repairing or coppering of a vessel, or the putting in of masts, boilers or machinery

Hecker *v.* New York Balance Dock Company.

of a steam boat. All of which uses are subject to the police regulations, and the direction of the proper officers heretofore adverted to. The special commercial use, which consists in the repair or coppering of a vessel, is quite as essential and important to navigation and commerce as any other; and it was well said on the argument, that it "is a use which precedes every other, and is a condition without which no other could exist." It is undeniable that the basins, piers and wharves in this city have from time immemorial been employed in this use at all times. Such use is not derived from any statute though recognized by it, as it necessarily originated before any legislation on the subject. Vessels could not go on to the land for reparation, and, *ex necessitate,* that work to them must be done on the water.

This legal and legitimate commercial use of the basins, piers and wharves, for the repair, caulking or coppering of vessels has been frequent, and now is in express terms recognized by the statutes of this state, as well as by the ordinances of the common council. The act of the legislature which fixes the rate of wharfage, passed March 31st, 1801, by section 2 provides : That whenever any ship or vessel shall be brought to any *dock* or *wharf* to repair or careen, and it shall be found necessary to sling or erect any stage or stages on the sides of the said vessel, for the more convenient caulking or repairing the same, or where any boats, scows or floating stages are brought alongside said vessel for the purpose of caulking, repairing or careening as aforesaid, it shall and may be lawful for the owner or owners of said wharf to take and receive thirty-three and one-third per cent in addition to the sum the said vessel is liable and compelled to pay for the wharfage aforesaid. (*See* § 213, *R. L.* 1813, *Davies' Laws, p.* 552.) A subsequent section of the same act fixes the rate of cranage for taking out and putting in masts of vessels lying at the wharves. These provisions are now, and for the last fifty years have been, in force and in constant and daily application. (*See Laws of* 1801, *ch* 115, 2 *Web.* 123, *Davies' Laws, p.* 400.)

It is thus seen, that the use of the basins, slips and piers for the repairing of vessels has been constant and unvarying, and

expressly sanctioned by legislative enactment. No higher approval could be given. Is the mode of reparation now practiced by the defendants of such character as to abrogate this long continued practice and sanction? At an early period, when vessels were small and easily handled, the form in which this use was enjoyed was by careening the vessel afloat in the basin, thus necessarily occupying a larger portion of the basin than when the vessel was erect, and also a very large portion of the adjoining pier, or by slinging stages on its sides, or drawing alongside boats, scows or floating stages, or heaving out the vessel upon the shore between the piers. Then by drawing the vessel out of the water upon ways. Still later it was by lifting the vessel in a cradle, strung on chains, or by the hydraulic or screw dock. And now in the new form used by these defendants, made necessary by the increased size of the vessels, by which the ship, after being floated or towed into a submerged wooden vessel, was then raised by pumping the water out of its tanks in its bottom. It is now 16 years since this form of repairing vessels has been used, and one of the defendants' docks has for the last ten years occupied the basin between piers No. 41 and 42, nearly opposite the plaintiff Robert's store; and so far as it appears, without complaint from him. That dock has now been removed into the basin between piers No. 40 and 41, and of which the plaintiffs in the first above entitled suit complain; and the plaintiff in the second suit complains of the defendants' placing another dock in the basin vacated by the dock removed to the adjoining basin. I cannot fail to see that this new form and mode of using the basins or slips for the reparation of vessels greatly lessens the time necessarily occupied for such purpose, and greatly diminishes the space also necessary. Neither can I see that it is any legal objection that the corporation, by its proper officer, in the exercise of its conceded powers, has deemed it proper to assign certain localities where this reparation is to take place. I cannot fail, also, to see that this new and improved form of doing this work, leaves larger portions and a greater number of slips for the loading and discharging of cargoes, than could have

been so occupied under the former system. This latter mode of using the basins, piers or wharves, for the repair or coppering, or caulking of vessels, is but a new and improved form of an old and well established use. For the nature of the use is not changed, but only its form. The new form occupies less space in the basin, or at the pier or wharf; first, because a ship taken up perpendicularly requires less space than one careened, with its masts and spars, and less than one repaired by means of floating stages, boats or scows; and in this connection the fact is significant, that after the new mode had come into use, regulations were made by the common council, restraining the old mode of repairing by careening, &c., in the public slips, thus giving the preference to the new mode. The statutes of the state, however, remained unchanged   Secondly, the present mode, as before observed, greatly shortens the time of repairing, and a slip used for this purpose would, by this mode, accommodate a much larger number of vessels than it would by the old process. But I must regard the new form or process of reparation as indispensable to the use itself in the present size of vessels, and the increased wants of our expanding commerce. These changes have outgrown the possibility of hauling them in the old mode on to the shore, or by careening or repairing them by floats or scows. They cannot be handled as smaller and differently constructed vessels could, and this state of things has created an absolute necessity for the new and improved mode. The old mode of using the basins, &c. was sanctioned by long continued use, by legislative enactment, by the state, as well as regulation by the city government, and by judicial approval. How can the new, which produces less interruption to commerce, which occupies less space and less time in doing the same thing in another way, and objectionable only on the ground that it occupies the same space which vessels must themselves have occupied for the same object, be deemed a nuisance, and an illegal obstruction to the navigable waters of the state? I confess myself unable to follow the train of reasoning which arrives at such a result. The law expands and adapts itself to embrace, provide for, and protect every new

form of an old use which may, from time to time, be invented to facilitate the use of any thing subservient to the wants and comforts of man, by improving its form, or to meet a new exigency in that use. (*Per Jones, J., Drake* v. *The Hudson River Rail Road Co.,* 7 *Barb.* 546--8.)

I have no doubt that it is my duty to discharge the temporary injunction in both cases.

Ordered accordingly.

[NEW YORK SPECIAL TERM, April 24, 1857. *Davies,* Justice.]