CAROLINE TRACY *vs.* THE NORWICH AND WORCESTER RAILROAD COMPANY.

*N* in 1818 sunk an old scow filled with stones in a navigable river on a flat between two channels, and constructed a rude pier thereon, which he used for fishing, but which was overflowed at high water. By gradual accretion of sand an island was finally formed, which emerged from the flats about the year 1845. *N* died during this year, having used the pier and the ground forming around it for fishing purposes and for those purposes only. The pier was also kept in repair by him during this time and he claimed the place as his own property. In 1845 *D*, a son of *N*, claimed the island as his heir and used it in the same way till his death in 1864, when another son took it and occupied it in the same way until his death in 1866, at which time it was inventoried as a part of his estate. From the first construction of the pier down to this time the pier and the island were used by large numbers of people for fishing, without license from any one and without payment. The claim of *N* and his sons that the place was their own property did not appear to have been recognized by others or to have been enforced or generally made known. Held that neither *N* nor his sons were in such exclusive and adverse possession as to acquire title against the state or any other owner.

Their occupation was rightful, as being the exercise of a right common to all the public, and so was not adverse.

An island emerging from navigable waters vests in the state.

A grant from the state may be presumed from long-continued exclusive and adverse possession.

It is well settled law in this state that in the action of disseizen or ejectment, the plaintiff must recover, if at all, by the strength of his own title.

EJECTMENT, to recover possession of a tract of land known as Tracy's Island in the River Thames; brought to the

Superior Court in New London County, and tried on the general issue closed to the court. The court found the following facts :

Previously to the year 1818, in the middle of the Thames River, just below the junction of the Shetucket and Yantic rivers at Norwich, there were flats or middle ground, then covered with water about three feet at ordinary low tides.

East of these flats was a channel, and also one west of the same. The eastern channel was more narrow but deeper than the western one, and before and up to 1818 had been used for the navigation of the larger vessels coming to Norwich; after 1818 the eastern channel was used but little for purposes of navigation and ceased to be used as such entirely in 1836.

In 1818 one Nathaniel Tracy, the father of the plaintiff, a resident of Norwich and a fisherman, filled an old scow with stones, and sunk it on the flats at a place where the water at ordinary low tide was about three feet deep, and filled in with stones upon and around the scow when sunk, so that it was above water at low tides, for the purpose of making a pier for drawing seines and fishing purposes generally, and for no other purpose.

In 1835 the government of the United States built a solid stone pier from the shore east of the eastern channel, and below the flats entirely across the eastern channel, and in 1836 another solid stone pier above the flats from the same shore across the channel, which entirely prevented thereafter all navigation of the channel, and since 1836 only the western channel has been used for the passage of vessels to and from Norwich.

The fishing pier as originally constructed was from twenty to twenty-five feet in length crosswise of the river, and about twelve feet wide, and was built entirely by the labor of Nathaniel Tracy, and from materials and by labor paid for by him, and was by him repaired from time to time as it became necessary, until it became covered with sand.

From 1818 to 1836 the sand slowly collected on and

around the pier, so that it was out of water at half tide, but no land was visible above water at ordinary high tide at the latter period.

After the piers were built by the government in 1836 the sand was deposited more rapidly on and around the pier, and about. the year 1845 land began to appear above ordinary high water. In March, 1868, an island had been formed on and around the pier containing a half acre and nine rods of land above water at ordinary high tide, which island is the land in controversy. The pier was known as "Tracy's Pier," while it remained a pier, and as "Tracy's Island," after land had been formed by the accretions of sand.

Nathaniel Tracy, after building the pier, always claimed it as his own, and used it for fishing purposes, and also claimed and used as his own for the same purposes the land so formed on and around the pier until his death, which occurred in 1845. Afterwards his son Daniel, a brother of the plaintiff, claimed and used it as an heir of Nathaniel Tracy until his death in 1864. He fished there, and cleared up the island in the spring. Neither Nathaniel Tracy nor any of his heirs have ever paid taxes on the island, nor was the pier or island inventoried in the estate of either Nathaniel or Daniel Tracy. After the decease of Daniel, another brother of the plaintiff, John Tracy, claimed and used the island as an heir of Nathaniel Tracy until his death in 1866. He fished there, and each year mowed the grass growing thereon, and his interest in the property was inventoried as a part of his estate.

From the time the pier was built, down to the death of Daniel in 1864, the pier and island were used by large numbers of persons for fishing, without license from any one, and without payment to Nathaniel, or any of his heirs, for the use of the same, except by one person who made payment for such use to Nathaniel in his life time.

It appeared from the testimony that one William Peckham had used the island for fishing. The plaintiff offered evidence

to show that Peckham died in 1869, and that before his death
he had stated in some place in the city of Norwich that he
had paid for the same. If such testimony be admissible then
two have paid for such use. The island has been used by
others than Nathaniel Tracy or his heirs, when and as they
pleased, to draw up sloops and small boats for repairing and
painting, and as a place of deposit for spars and masts by
shipbuilders, and also for old decaying vessels, and portions
of the same below high water mark for depositing oysters,
all without license from any one. Sand has also been taken
from the island without permission from any one. Neither
Nathaniel Tracy nor any of his children ever in any way
interfered with such use of the island by others than mem-
bers of the family, until in 1865, when one Harvey Chapman
was sued by John Tracy for fishing on the island, and agreed
to pay five dollars to settle the suit.

The defendants, by a conveyance in 1838 and by an addi-
tional conveyance in 1845, became, and have ever since been,
the owners of the entire east shore of the old eastern channel
above, in front of, and below, the place where the fishing
pier was located by Nathaniel Tracy, and the whole of the
island formed on and around the same. Sometime in 1860
they commenced a survey for the purpose of building a wharf
on the eastern part of the western channel in front of their
premises, to be used in connection with their railroad, and
for that purpose went upon the island in question, which lay
between their premises and the western channel, but of which
survey and purpose the plaintiff had no knowledge. In 1866
the defendants voted to build the wharf. On the 7th day of
May, 1867, and as soon as the plaintiff had knowledge of the
vote and of the purpose of the defendants, she notified them
that she was the owner of the island and should resist any
attempts on their part to erect a wharf on any part of it;
after which notice, and before any suit was brought, the
defendants ousted the plaintiff. The plaintiff brought an
action of ejectment against the defendants, by writ dated
June 30, 1868, returnable to the September term of the

Superior Court for New London County, of the same year, demanding the seizin and quiet possession of the premises in question, and withdrew the same at the September term of the court in the year 1870. She also, on the 30th day of June, 1868, brought a petition for an injunction against the defendants to restrain them from covering over the island, which was withdrawn at the September term of the Superior Court in the year 1869. The defendants have built their wharf, and, in so doing, have covered over a portion of the island above ordinary high tide.

Upon these facts the case was reserved by the Superior Court for the advice of this court.

*A. F. Park* and *Lucas*, for the plaintiff.

1. The case finds that after May, 1867, and before the commencement of the present suit, the defendants ousted the plaintiff. Previous to this ouster they never had any possession of the pier or island. This priority of possession renders it unnecessary for her to prove a grant, or to raise a presumption of a grant by the state, and the plaintiff can recover, unless the defendants have shown title in themselves. *Slater v. Rawson,* 6 Metc., 439; *Hubbard* v. *Little,* 9 Cush., 475; *Currier* v. *Gale,* 9 Allen, 522; *Jackson* v. *Kisselbrack,* 10 Johns., 336. But if the plaintiff must show a better title than the defendants, then we say that the original construction of the pier by Nathaniel Tracy, by his own labor, and at his own expense, whereby the land on which it was constructed was taken possession of and made useful and valuable, and the subsequent repairs of the pier by him, with his long continued possession and use of the pier and of the island when formed, under a claim of right, and the subsequent possession and use by his sons under a claim of right, their care of it, with the public recognition of the title of Nathaniel Tracy, no one ever making any claim to the island till as late as 1867, certainly present a claim of right in the plaintiff that is far superior to that of any one else, and sufficient for the purposes of the present case.

2. The plaintiff had not only this prior possessory title and this equitable right, but she has a full legal title. 1. She inherited an undivided share in the premises from her father ; and an undivided interest is sufficient title to maintain an action of ejectment. Kelsey v. Hanmer, 18 Conn., 315. 2. The possession and occupancy of the island under a claim of right by her father, after her father's decease were in law her possession and occupancy. Bryan v. Atwater, 5 Day, 191. 3. There being a ship channel between the land on which Nathaniel Tracy built the pier and the eastern shore, the riparian proprietor had no more right to that land, or to wharf over it, than any other member of the public. His right to wharf out was simply a franchise, and only extended at most to the eastern shore of the eastern channel. Simons v. French, 25 Conn., 346. 4. The pier having been built between two ship channels, the land on which it was erected was as free to the public as the water passing over it. As it did not interfere with navigation and was built for fishing purposes, Nathaniel Tracy had a right to build it, and having built it with his own labor and at his own expense, he acquired a right to occupy it in preference to any one else. His subsequent continued occupancy and that of his heirs under a claim of right, was a possession in an unbroken continuance of that acquired right, and preserved and strengthened it. Pitkin v. Olmstead, 1 Root, 217. 5. The pier was built in 1818, and was from this time known as "Tracy's Pier" by the public (thereby recognizing the plaintiff's right), and was repaired by Nathaniel Tracy from time to time, and this claim, use and occupancy by Nathaniel Tracy had continued for nearly seventeen years before the riparian proprietor's right to wharf out to the pier existed, as the channel was not closed till 1835. We contend that he had acquired a right that it was not in the power of the riparian proprietor to defeat by virtue of any franchise that accrued to him to wharf out by reason of the discontinuance of the eastern channel. 6. But if Nathaniel Tracy had not acquired any rights which the riparian proprietor was bound to respect at the time the eastern channel was closed by the government,

Tracy v. The Norwich and Worcester Railroad Co.

(which will hardly be claimed,) yet, whatever was done by him under a claim of right was, from the time the channel was closed, adverse to the right of the riparian proprietor to wharf out over the pier. He continued to occupy and claim this pier and island till 1845, and neither the adjoining proprietors, nor the defendants their grantees, made any claim to it during his life. 7. After the death of Nathaniel the island was used and claimed by his heirs till 1868, when the plaintiff was ousted by the defendants, showing an occupancy and possession under a just claim of right for fifty years by Nathaniel Tracy and his heirs, and twenty-three years after land appeared above high water mark; and we contend that an occupancy of this character and duration ought to be conclusive as against every one, and especially these defendants, who never claimed any right to the island, and hope to defeat the plaintiff only by showing that the title still remains in the state. *Chapman* v. *Kimball*, 9 Conn., 40, 41.

3. The defendants in the court below contended that the plaintiff took nothing by reason of the construction of the pier and the subsequent use and occupancy of the pier and island under a claim of right, because the title to the land at the time the pier was built was in the state, from which a title could be acquired only by grant, or by such an occupancy that a grant would be presumed therefrom, and they insisted that the occupancy was not of such a character as the law required, because not exclusive. 1st. There can be no doubt that this occupancy was exclusive as against them; and the state, if necessary to prevent injustice, ought to be held to have abandoned the right to the land. 2d. When Nathaniel Tracy built the pier he at that time took possession of the land on which it was built. He then appropriated it, and whether rightfully or wrongfully is immaterial. That possession was sufficiently adverse, and was never lost till the plaintiff was ousted in 1868, thirty years after the defendants became the owners of the adjoining shore. The acts of Nathaniel Tracy and his heirs in taking possession, occupying, improving and claiming the pier and the land, are very

different in their character and effect from the acts of those who went on there without their knowledge perhaps, or casually, and certainly without any claim to the pier or land, and so far as it appears without any claim to the right of fishing. There is nothing stated in the case that tends to show that the possession under which the plaintiff claims was not exclusive from 1818 to 1868, within the meaning of the law. *French* v. *Pierce,* 8 Conn., 439; *Burrows* v. *Gallup,* 32 id., 493; 2 Washb. R. Prop., 489, 490, 595.

4. The right to wharf out is simply a right to wharf out into a navigable river, not over an island formed on the bed of the river. Such islands are as much land as the main land, and the same riparian rights attach to them. This land has been an island since 1845, and unless the defendants own the island itself they have no right to do what they have done. *Middletown* v. *Sage,* 8 Conn., 228.

*Wait* and *Halsey,* with whom was *Swan,* for the defendants.

1. The record shows no title in the plaintiff. This is necessary, as she can recover only by the strength of her own title. *Talcott* v. *Goodwin,* 3 Day, 267. It is not found as a fact; and it cannot be legally inferred from the facts found. 1. This flat was in the bed of a navigable river, and the title to it was in the state, for the public use and benefit. *East Haven* v. *Hemingway,* 7 Conn., 198; *Middletown* v. *Sage,* 8 id., 228; *Chapman* v. *Kimball,* 9 id., 38; *Hollister* v. *Union Co.,* id., 443; *Nichols* v. *Lewis,* 15 id., 143; *Simons* v. *French,* 25 id., 352; *Church* v. *Meeker,* 34 id., 427. 2. The plaintiff, and those under whom she claims, could only acquire title to the premises by grant from the sovereign authority or by adverse possession. *Chapman* v. *Kimball,* 9 Conn., 38; 3 Kent Com., 427, 431. 3. The plaintiff, and those under whom she claims, have had no adverse exclusive possession against the state, or the riparian proprietor. It is not enough that they have fished there, or claimed the premises. Fishing was but the exercise of a common right. It could not be adverse to the rights of the public unless they were excluded.

*Chalker* v. *Dickinson*, 1 Conn., 382; *Burrows* v. *Gallup*, 32 id., 493; *Church* v. *Meeker*, 34 id., 429; Angell on Tide Waters, 275. The record shows that from the time the pier was built in 1818, down to the death of Daniel Tracy in 1864, the pier and island were used by a large number of persons. for fishing without license from any one, and without payment, except in one instance. The island, since it began to appear above the tide, has also been used and occupied by others, as they pleased, for a great variety of purposes without interference, down to 1865. The use of the island was as public and as free as the use of the waters of the river had been before the island appeared. The old scow was sunk to prepare a place for fishing purposes only. It was not until 1845 that sand began to appear above ordinary high water. Nathaniel Tracy used it for fishing until he died, in 1845. Afterwards his son Daniel used it until he died, in 1864. After his death, John Tracy used it until he died, in 1866. He mowed the grass growing there for two years. During all this time the public used it for fishing; and all other purposes that it could be used for as public property. The itinerant character of the use by Nathaniel Tracy and his sons, and the fact that it did not interfere with any public use, or right of the riparian proprietor, shows that it was not in any sense adverse and exclusive, so as to acquire a title by possession. 4. The doctrine of adverse possession is to be taken strictly. Such a possession is not to be made out by inference, but by clear and positive proof. Every presumption is in favor of possession in subordination to the title of the true owner. *Huntington* v. *Whaley*, 29 Conn., 398. 5. The only recognition of any right in the Tracys, was by one person who made payment to Nathaniel Tracy in his lifetime. The only acts done asserting title, or any interference with the public, was a suit against Harvey Chapman, for fishing there, in 1865, and an action of ejectment and petition for an injunction brought by the present plaintiff against the defendants in 1868, both of which were withdrawn.

2. The defendants are lawfully exercising their rights as

riparian proprietors. 1st. They own the shore in fee. 2d. As such owners, they have the right of wharfing out towards the channel, for the benefit of navigation and commerce. *East Haven* v. *Hemingway*, 7 Conn., 202; *Chapman* v. *Kimball*, 9 id., 41; *Nichols* v. *Lewis*, 15 id., 143; *Simons* v. *French*, 25 id., 352; *Lockwood* v. *N. York & N. Haven R. R. Co.*, 37 id., 391; Angell on Tide Waters, 196. 3d. There is only one channel towards which they can wharf. The old eastern channel has been filled up by authority of the United States. It originally extended from the main channel at the lower end of the defendants' wharf, to the mouth of the Shetucket. In 1835 a pier was built across the lower end, and in 1836 another across the upper end, thus closing up the channel, and turning the current of the river into the west channel. As a consequence, the space between the two piers rapidly filled in with sand. Our right of wharfing must extend across these flats towards the west channel, or we could have no wharf to which vessels could come. 4th. The change of this channel was within the power vested in Congress by the constitution of the United States. Const., Art. 1, sec. 8; 1 Kent. Com., 267, 268; *Dutton* v. *Strong*, 1 Black, 23.

SEYMOUR, J. The premises of which the plaintiff in her writ demands possession became an island in the river Thames in 1845, in that year emerging from the flats above ordinary high water mark.

The plaintiff's father, Nathaniel Tracy, was a fisherman, and in 1818 he sunk an old scow filled with stones on the flats between channels of the river then navigable. He thus constructed a kind of pier by means of which and by the gradual accretion of sand an island was ultimately formed, which, as before stated, emerged from the flats about the year 1845. The plaintiff's father died during this year 1845, having from 1818 down to the time of his death used the pier and the land formed on and around it for fishing purposes and for such purposes only, that being the purpose for which the scow was sunk and the pier constructed. The record also states that the pier was from time to time re-

paired by the plaintiff's father and that in connection with this user he claimed the place as his own.

The counsel for the plaintiff claim that upon these facts Nathaniel Tracy acquired title to the premises in dispute, or that at least he had such possession of them as is available towards the acquisition of title when connected with the subsequent user of his sons.

In regard to these claims it is to be observed, first, that the user of the premises by Tracy is not found to have been exclusive of others ; on the other hand the record is that the pier and island were used by large numbers of persons for fishing without license from any one, and without payment for such use, except in one or two instances. And, second, that during the life of Nathaniel Tracy the premises were daily covered by the tide, and that the right to use the premises as portion of the tide water of the state was common to all mankind. Mr. Tracy had no use of the property except such as was rightful ; such as he might, as one of the public, rightfully demand and enforce. The sinking of the scow and constructing a kind of pier for his own convenience as a fisherman was lawful and subjected him to no civil action or criminal prosecution. By the exercise of his legitimate common right he could gain no private or exclusive right for himself. In this respect he is like a tenant in common who gains no title against his co-tenants by mere occupation and possession of the joint property, unless such possession is clearly shown to be exclusive, and hostile to his companions. It is indeed stated that Nathaniel Tracy claimed the pier and the land formed on and around it as his own, and used it for fishing purposes, but this naked claim does not appear to have been recognized or acquiesced in by others, nor to have been enforced or acted upon, nor indeed to have been made known, except in the one or two instances referred to. Such a mere claim, without acts hostile to the common rights of the public, subjected him to no legal liability. Neither the commonwealth nor any of its citizens were thereby disseized, dispossessed, or injured.

Even if the user had been exclusive and adverse, still it

was for fishing purposes only, and was the user of a flat below ordinary high water-mark. It is difficult to see how a title in fee to land could be acquired, or begin to be acquired, by such a user of such a subject.

In 1845 the flat became an island, and thenceforth certainly the subject of a title in fee, and like other real estate capable of being acquired by continued and adverse possession.

It is settled law in Connecticut that the title to an island emerging as this did, in navigable waters, vests in the state, and is also settled law that a grant from the state may be presumed in favor of long-continued exclusive and adverse possession. And this leads us to pursue the history of the property in dispute after it became land. Daniel Tracy, a son of Nathaniel, and brother of the plaintiff, claimed it as heir of his father, and used it until his death in 1864. He fished there and in the spring cleared it up. After Daniel's death another of the plaintiff's brothers claimed and used the island as heir of his father Nathaniel, until 1866, when he died. He fished there, and each year mowed the grass, and his interest was inventoried as part of his estate. Upon these facts, if these were all, a case is presented indicating a continued adverse holding of the premises under claim of title. But the record goes on to state that from the time the pier was built, in 1818, down to the death of Daniel, in 1864, the pier and island were used by large numbers of persons for fishing without license from any one, and, except in two instances referred to heretofore, without payment to any one for the use ; and after the flat became an island, it was used by others than the Tracys, when and as such others pleased, for various purposes detailed in the record, all without license from any one, and without interference with such use.

Upon these facts it seems to us that the Tracys were never in exclusive possession so as to acquire title against the state or against any one else. The property after it became an island was used, it seems, in common, being treated as continuing to be common and public property, just as the flat had been used before the island was formed.

VOL. XXXIX.—50

Tracy v. The Norwich and Worcester Railroad Co.

The point was made by the plaintiff's counsel that in this action of disseizin the plaintiff may recover upon proof of mere possession without showing title in himself. Upon the view we have taken of the facts that question does not necessarily arise, for the plaintiff is not found to have been in exclusive possession at the time of the alleged ouster. We however ought to say that we regard it as elementary law in Connecticut that in this action of disseizin or ejectment the plaintiff must recover, if he recover at all, by the strength of his own title. Ample remedies are provided by actions of trespass and by proceedings for forcible entry and detainer for the disturbance of quiet possession, and we see no good reason for any change or mitigation of the familiar rule in respect to proof of title in ejectment.

The Superior Court is advised to render judgment for the defendants.

In this opinion the other judges concurred.