Marsh, Commissioner.
At this early stage of the proceedings, a question of great importance is submitted to the commissioners of appraisement, the determination of which will probably admit or exclude a large mass of evidence herein.
The owners of Goat Island and the smaller isles in proximity, claim that they, on this appraisement, are entitled to the-use of the water power afforded by the Niagara River a s it flows past them, and that the State of New York, if it takes these islands under the right of eminent domain, for the purpose contemplated by this proceeding, should compensate such owners for the value of the hydraulic power of which they would be thus deprived ; and that such compensation should embrace, not only such part of the power as has been utilized by the owners, but also the possibilities of use which may be devised or contrived in the future.
On the other hand, the representative of the State Reservation at Niagara, claims that, the Niagara River is a public and navigable stream; a boundary between the United States and the Dominion of Canada; of great magnitude and importance ; of such a character, indeed, that the old common law rule that owners of land bordering on a river take title to the middle of the stream, does not apply ; that the State has never expressly or by implication, granted the bed of the river ; that such bed, and the waters that flow over it, are the property of the State ; and that when the State, *173 for public purposes, chooses to resume the ownership and possession of the islands in the river, on compensation to the owners, the value of the water power which is or may be available to the occupants of the islands, constitutes no part of the compensation which the State is bound, in law or equity, to pay.
This is the question we are now to pass upon.
The patent of the State to Augustus Porter, dated in 1816 (together with patents of the main land, opposite), granting Groat and the small attendant islands, has been laid before us. It is a grant of the islands as such, stating that they contain about sixty-two acres, and containing no words which evince any expressed intent to convey anything more than the sixty-two acres, nor the land under water outside of the boundaries of the islands. If the State had entertained an affirmative intention to convey by this grant any part of the river bed, it could have effectuated that intent by the language of the patent. Not having done so, it leaves the claim of the grantees to rest upon constructive implication; so that the question arises whether by such a grant, the title of the grantees is extended, by implication, beyond the boundaries mentioned in the grant—to wit: the islands—into the bed of the river. This must depend upon the rules of construction, adopted by the courts of .New York, as applied to grants of land upon running rivers.
An inference of some strength against any intent of the State to convey the bed of the stream by this patent, may be drawn from the very fact of the patent itself; for, if the principle claimed by the owners is applicable to this patent, no reason is obvious why it should not have been equally applicable to the prior patent of the main land opposite, in 1814, to Porter & Barton; in which event there would have been no necessity for the patent of the islands in 1816, as they would thus have passed, by construction, from the *174 State to Porter & Barton, by the patent of June 27, 1814.
Does the law put such a construction upon this grant, as extends the title of the grantee beyond the island and into the bed of the river 1
By the well-known common law rule, grants of land bounded on a navigable river conveyed only to the margin of the river, but, where bounded on,a non-navigable river, they were held, by construction, to be bounded by the center of the stream, and to convey the bed of the river, usque ad medium files.
By the law pronounced by the courts of New York, the rule of construction which carries title to the middle of the stream does not apply where grants of land are bounded on navigable rivers, or on those which form the boundaries between nations or States. And so the principal question to be discussed here, is, whether the Niagara River is either a navigable or a boundary stream, or both.
In the exhaustive oral argument before us, as well as in the various voluminous briefs submitted, since, —that of Ansley Wilcox, Esq., representing the commissioners of the State Reservation at Niagara; of Hon. E. C. Sprague, of counsel for the proprietors of Groat Island and the other isles; and of L. N. Bangs, Esq., on behalf of Mr. Woodruff and the Niagara Falls Paper Manufacturing Company, occupying a portion of Bath Island ;—the whole domain of law on the subject of riparian ownership and rights has been industriously explored; the authorities, elementary and judicial, of England, of our sister States, and of New York, brought under review ; the doctrines traced back to their origin ; the principles arranged and classified; the distinctions pointed out and deepened ; and every aid furnished which research could develop, or labor and ability marshal and enforce. But we do not think it necessary to enter upon this broad field *175 and traverse its full extent. The tribunals of our own State,—subordinate to whose judgments we are to act —have, at different times, now through many years, passed upon subjects kindred to those here involved ; and some, indeed, upon the identical questions now-submitted to us ; and by their authoritative labors relieved us from the responsibility of eliminating the true doctrine from the multitudinous reports.
If, as is claimed, it shall be found, on tracing the law of riparian ownership to its source, that the expressions of our own judges have gone beyond the logical results deducible from the admitted premises, it will be for our appellate court, and not for us, to make the correction. In passing, however, it is proper to say, that these decisions are in unison with the conclusions we should arrive at, were we to dispose of the questions on principle instead of on authority.
The supreme court, to which, by the act under which this commission was appointed, is given the review of our action and judgment,—and those decisions therefore are of controlling force with us,—has been called to apply the doctrine of riparian rights and ownership, ’to the very river which is the subject of our consideration.
In Kingman v. Sparrow (12 Barb. 201) it is announced as the judgment of the general term in the eighth district—within whose jurisdiction the locus in quo is situated—that the common law rule, as applied to grants bounding premises on rivers, has no application to lands bounded on the Niagara River, on the grounds that it is both a navigable and boundary stream. This decision stands unreversed, and has not, so far as we have seen, in any adjudicated case, been subjected to hostile criticism. It makes the law for us in regard to this river, and relieves us from the necessity of an extended study of the decisions in England ; or in the States of the Union ; or even in *176 our State in regard to the Hudson, the Mohawk, and other rivers.
This very question as to the Niagara River, has also been distinctly presented in Hensler v. Hartman,* *177 decided in 1873, by John Gf-. Milbnrn, Esq., Referee, in the supreme court, and which decision stands as the judgment of that court.
*178 It was there held that as the Niagara River was a natural boundary between this country and a foreign nation, the title to the center of the bed did not there *179 fore pass by the grant of the State ; and that land formed by imperceptible accretion, or by actual reclamation from deposits by the adjacent owners, in the *180 bed of the river, follows the title of the bed, and is vested in the State.
We consider these- two cases as express decisions *181 upon the very questions before us, and which, even were we disposed, we are not at liberty to disregard.
The Niagara river, like the St. Lawrence, seems to *182 have been deemed by our courts, as so clear and eminent an instance of non-applicability of the common law rule, that it is sometimes cited as an undoubted *183 illustration of that class of rivers where the riparian proprietors do not take title to the bed of the stream; as by Judge E. B. Smith, in the People v. Gutchess *184 (48 Barb. 656, 666); by Judge Barker, in the Buffalo Pipe Line Co. v. N. Y., L. E. & W. R. R. Co. (10 Abb. N. C.107, 110); by Senator Beardsley, in Canal Commissioners v. People, 5 Wend. 423, 446, 462); and by Senator-Tracy in the Canal Appraisers v. People (17 Wend. 570, 571, 623); the latter saying : “ The rivers of Niagara and. St. Lawrence for instance are acknowledgedly public rivers, in every sense, as much as if they were arms of the sea, into which the tide flowed.” And these references to the Niagara River seem to have been made to it quite as much in reference to its magnitude and navigability, as to its position as a boundary of our empire. The great proposition stands, therefore, on a double ground ; and two elements unite to rescue this river from the dominion of the common law rule.
Whatever conflict has taken place in the courts of New York in reference to the extension of the rights of riparian owners into the beds of navigable rivers, there has been none, we believe, in relation to streams *185 constituting a boundary between the territory of the United States and that of a foreign country
Those judges who have maintained the applicability of the common law rule to our inland, fresh wafer, navigable streams, have excepted boundary rivers from the rule; witness the dissenting opinion of Chancellor Walworth in the case of Canal Appraisers v. People (17 Wend. 570, 597, 598) and the opinion of Chief Justice Rug-re in the very recent case Smith v. City of Rochester (92 N. Y. 463, 479). Ho case can be found, we think, in the courts of Hew York, where any intimation is thrown out, much less decision made, that, in the case of empire-dividing streams, especially of such magitude and dignity as the St. Lawrence and the Hiagara, and having the navigable qualities they possess, the law, without unmistakable affirmative grants from the State conveying the title, has permitted the proprietors of the land bounded on such streams, to.extend their ownership, by implication, beyond the margin of the rivers and to the center of their beds.
It would be impossible to render any decision on this question which should quadrate with the authorities of all the States ; for the tribunals ot’ some of them implicitly follow and adopt the common law rale in all particulars, while those of others, and especially of our own State, give consideration to the different geography and changed circumstances to our country from those of the land where that rule originated ; and have regard to those majestic streams which gather their power and immensity, not, as in England, from the ebb and reflux of salt water from the ocean, but from the mountains and extensive watersheds of the interior, and which are far removed from tidal influence. We think it well established as the law of this State that a river of the importance, dimensions and navigability of the Hiagara, and parting two nations,—in *186 fine, that the Niagara River—rises above the rank of those inland streams of fresh water, where the bordering owners, by the mere force of being bounded, in their grants, upon the river, take title to the middle of the flow.
It is argued that the late case of Smith v. City of Rochester (92 N. Y. 463), already referred to, has weakened the force of prior decisions in this State, as establishing the public rights to the bed of inland navigable rivers. But it seems unnecessary for us to analyze that high authority, inasmuch as it expressly excepts “ streams forming the boundary line between States ” (p. 479) from the rule restricting the right of the State in the absolute control and proprietorship of the bed of the rivers. The Chief Justice cites, with, approbation, the case of the Canal Commissioners v. People (5 Wend. 423, 446), in which Senator Beardsley says (p.462): ‘"It is therefore preposterous to contend that the limited doctrines of the common law, are applicable to the Mississippi, Ohio, Susquehanna, Niagara and St. Lawrence. If applicable, the owners of land on those streams have a right to go to the centre oí' the rivers, and Grand Island, in the Niagara with 18,1 00 acres, would belong to the owner of the shore.”
It is claimed by the owners of the Island that the interruption of navigation at the point in question caused by the great cataract, and the impetuosity of the waters for some distance above, and the dangerous swirls below, extending, it may be, for several miles, take away the navigable character of the river at this point, and subject it to the common law rule as to riparian ownership of non-navigable, fresh water streams.
In the case of Canal Comm’rs v. People (5 Wend. 423), and Canal Appraisers v. People (17 Id. 570, 571), damages were claimed for the destruction of a water *187 fall in a navigable river, which waterfall necessarily rendered the stream unnavigable, in fact, at that point 5 and yet such interruption was not held to destroy the navigability of the river as to bring it under the common law rule.
So, the Mohawk river is held to be a navigable river, although its navigation is interrupted where, at Little Falls, it forces its way through the rocks, and flows through deep ravines (People v. Canal Appraisers, 33 N. Y. 461), and also where, at Cohoes, one mile from its mouth, it falls over a precipice of seventy feet in perpendicular height.
A river navigable in its general character does not change its legal characteristics in that respect, by a disturbance which, at a given point, breaks the continuity of the actual navigation. And we are, therefore, obliged to apply to the Niagara Eiver, at the Falls, the same principles which govern navigable streams; and to hold that the owners of Goat Island, and the other isles, do not carry their title to the middle' of the stream, nor even to the middle of the American portion of the stream, but only to the boundary of the islands; that the bed of the river surrounding those islands belongs to the State, as do the waters that flow over it; and that whatever rights, short of prescriptive rights, may be claimed by the island proprietors, in the use of the waters running past their premises, they are subject and subordinate to the rights of the State, as owner of the bed of the river, and may be lawfully terminated whenever the State may-choose to resume its sovereignty, as it may, at any time, without cost or liability to such proprietors for any damage to them (People v. Tibbets, 19 N. Y. 523, 528). In addition to this, it is not to be forgotten, that notwithstanding this impediment in the actual navigability of the river, the frontier character of the *188 stream is not affected by it, nor the principles applicable to such a stream.
It is also contended by the counsel for the Island riparians, that upon the grant of the islands, a new -filum aguce was established, not only between them and the main land, but new ones between the islands themselves; that the floods which rush through the narrow interspaces can be regarded neither as navigable nor boundary streams ; and that it follows that the common law rule applies at those places, giving the island owners title, on each side respectively, to the center of the stream dividing the isles. But we think the river is to be considered as one river—a navigable and boundary stream—and that, though its great volume flows between these islands and the Canadian shore, and another portion,—perhaps a third part,— between such islands and the American shore, and smaller portions—very small indeed as compared with the great floods of the strait,—force their way between the anchored islands near the verge, yet the whole river does not, by any of these short divisions, change the nature of its entirety and become so many inconsiderable and different streams, losing the character it held before it took these smaller channels to the Falls, and which it again resumes immediately below.
Unless the owners of Goat Island take title to the middle of the stream as between that, island and the Canadian line, or, at least, between it and the American shore, we think they cannot be such owners— tosque ad filum aguce—between Goat Island and Bath, nor between Goat and Lunar Islands.
The conjectures of the counsel for the island proprietors that possible modes of using the waters, as a hydraulic power, may be devised, yet unknown, or, at least, unapplied, as by trenching the isles and sending the current through them, instead of obtaining by wing-dams the power from the bed of the river out-' *189 side the Island boundaries, is so far from any practical use yet adopted, that it seems to us too remote a probability to base a judgment upon. It Is a conjectural utilization of the power, which has not been made practical by adoption heretofore, and which could only be by a change of circumstances too fanciful for us to consider as a ground of judgment.
The question remains to be considered as to such portion of the water power as is, or has been, utilized, whether such use is of such a character and has existed for such a length of time, that it can give to the parties a right to it by prescription. This question we reserve for future consideration, thinking it better3 in the few cases for which the right is claimed, to act upon the evidence in that behalf which may be submitted.
Pratt, Comr., concurred in the results announced in the foregoing opinion.
Hale, Commissioner. First. As to the ownership of the bed of the river.
It is claimed by the land-owners that the common law rule, in respect to fresh water rivers, applies to the Niagara, and that the riparian owners claiming under the grants of the State to Porter and Barton, and to Barton individually, own to the medium jilum aquae.
The contrary of this doctrine has been held by the general term of the supreme court, sitting in the eighth district, in the case of Kingman v. Sparrow, 12 Barb. 201. This general term decision has been followed by Mr. J. Gr. Milburn, as referee, in the case of Hensler y. Hartman, in an able and carefully considered opinion.
The inapplicability of the common law doctrine to the Niagara River, has been recognized and admitted in every other reported case in this State to which our *190 attention has been called, in which the subject is referred to, including the case of Smith v. City of Rochester, 92 N. Y. 463.
If, therefore, we were inclined to take a different view of the question, as one of principle, we should not feel justified in disregarding the opinions so universally expressed by the courts of this State. We must hold, therefore, that the State is the owner of the bed of the Niagara River.
Second. Does the non-navigability of that portion of the river adjacent to the property in qtiestion, resulting from the rapids and falls, lead to any different result as to such portion of the river ?
There is no doubt that at common law a river may be partly navigable and partly non-navigable. The portion of a tidewater stream which is above the ebb and flow of the tide, is not at common law a navigable stream, and to the bed of such streams above tidewater the common law rights of riparian owners attach. The reason of the rule seems to have been, that, ordinarily, actual navigability does not extend up tidewater streams further than the ebb and flow of the tide, for the reason that such streams in England, above tidewater, are ordinarily too shallow, and contain too little water for the purposes of navigation. In the case of the Niagara River, however, the difficulties of navigation do not result from a want of water. No one can question that there is water enough passing the Rapids and Falls to float the commerce of the world. The river is navigable above the Rapids, and is also navigable below the Falls. The question is, whether a different rule as to title can be laid down for that section of the river which is rendered unnavigable by rocks, sudden descents and precipices ? We do not see that-such a distinction is practicable, nor have we been referred to any authority requiring us to so hold.
In the case of Morgan v. King, 35 N. Y. 454, relied *191 on by the counsel for the land-owners as an authority for the proposition that a portion of a river may be held to be unnavigable, although the river is navigable both above and below, no question arose as to the ownership of the river bed. There was no contention that any part of the Racket river was navigable, in a sense to exclude it from the application of the common law rule as to the ownership of its bed. The claim of the plaintiffs in that case was, that the public had an easement or right of way in the stream, for floating logs. It. was conceded that the defendant owned the river bed at the point where the alleged obstruction was put. The holding of the courts was, that at that point, the river being unnavigable in fact, there was no public easement, and that therefore the defendant’s right was not subject to such easement.
In the case of The Montello, (20 Wall. 430), the Pox river, Wisconsin, was held to be a navigable water of the United States, and the fact that there were obstructions to an unbroken navigation was held not to prevent it from so being. Judge Davis says, in his opinion : The vital and essential point is, whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties, by reason of natural barriers, such as rapids and sand-bars.” (p. 443.)
Third. It is claimed by the landowners that the portion of the Niagara river lying between Goat Island and the main shore, is to be considered as a separate stream, which is not navigable, and that therefore the grant of the main land to Porter and Barton, gave them title to the middle of the stream, and the subsequent grant of Goat Island to Porter gave him title from the island eastward to the middle of the stream *192 (fllvm aquas) between Groat Island and the New York shore.
After the taking of evidence had been completed, and the merits of the questions presented argued by counsel, the following final decision, signed by all the commissioners, was delivered.
By the Commission.—Hale, Commissioner.—The commissioners of appraisement have entered upon the duty of ascertaining the values of various pieces of property proposed to be taken for the State reservation with a deep sense of responsibility. They have recognized the fact that where property is compulsorily taken, as in this case, the “just and proper” compensation contemplated by the statute is a liberal compensation. They have intended therefore to award the full value of each piece of property considered. The difficulty they have found is to do this and at the same time deal fairly by the State, and exclude from consideration fictitious, conjectural and imaginative values. Opinions of witnesses are admitted in evidence to aid the judgment of the commissioners ; but the commissioners are not bound by any such opinions. If they were, where opinions vary so widely, it would be impossible to decide between them. Such opinions must be tested by the facts in evidence, and the commissioners must rely upon their own judgment, aided by the evidence both of facts and opinions, so far as aid can be thence derived. It is not proposed to state here the reasons which have governed them in the valuation of each parcel, but to mention some of the considerations which they have deemed important.
*192 We are cited to cases where it is held that the grant of an island by the owner of the bed of the stream and the main land, gives title to the middle of the stream, between the island and the shore. But these are cases of a non-navigable river, where the bed is the property of the riparian owner. The contrary of this is held as to a grant of an island in the Mississippi, in McManus v. Carmichael (3 Iowa, 1). We do not think that the patent of 1816 gave to Mr. Porter any title to the bed of the stream, in either direction from the islands.
Fourth. We think it is thoroughly settled in this State by authority, that where the State owns the bed of the stream, a riparian owner is not entitled to compensation for being deprived by the State of the use of the waters. The riparian owners may and doubtless have rights to these waters as against each other, and as against other private parties, but as against the State they have not such right, unless acquired by express grant, or by prescription raising a presumption of a grant. There is no claim here of an express grant. We think it best to receive any evidence offered to prove a prescriptive right, reserving the questions whether such right can be acquired as against the State, and if so, whether it has been so acquired and to what extent, and by whom, for further consideration.
1. As to the water power. The commissioners have not thought it necessary to decide the question which was so very thoroughly and ably argued before them, as to whether a prescriptive right to the use of the waters of the Niagara River can be obtained as against the State.* Differing somewhat in their views as to the strict legal question, they have concurred in the belief that it was just and proper to make allowance for such water power where it is now in use, and has been for the period prescribed by statute. They have, therefore, practically decided this question in favor of the claimants, and have allowed what in their judgment is the full value of the water power which has been used for the prescriptive period. In one case, that of Messrs. Hill and Murray, they have made such allowance even where a non-user for a number of years would seem to have been strictly fatal to the claim of prescription, j The value of the water power has been estimated at the rate which the great mass of testimony shows to prevail at Niagara Palls.
* See briefs of counsel on this point reported at the end of this-case.
2. As to the residence property, so called. In regard to the lots extending from Buffalo to River streets, of which a small portion of the River street end is proposed to be taken, we have been unable to concur with the opinions of the witnesses for the owners as to the extent of damages that the residue of the property would sustain in consequence of the taking. It has not seemed to us that such damage would be by any means as serious as apprehended by them. We cannot believe that the commissioners in charge of the State reservation or park, for the purpose of preserving the scenery, will so manage it that it will be a nuisance or an injury to the adjacent owners. It has seemed to us also that in most cases the owners of the property have not heretofore attached that extreme value to the river front of these premises and the views therefrom, which they now seem to attribute to them. This is shown by the fact that in many cases they have, by planting or maintaining trees, effectually deprived themselves of such views, and that in some instances they have built their barns and stables upon the part, of the lot commanding the finest views, while they have fronted their residences on Buffalo street. At the same time, the fact that they lose the legal control of this part of their lots, somewhat to the detriment of the residue, has been taken into consideration in making our estimates. We have intended to award in each case, (1) the full value of the land and buildings proposed to be taken, and (2) such compensation, varying with the different conditions and circumstances of each lot, as would in our judgment cover any damage reasonably likely to fall upon the residue of the property by reason of such taking. In other words, it has been our intention, to award as compensation the difference between the full value of each lot as now existing under the full control of its owner, and the value of the residue of such lot after the proposed part shall be taken for the purposes of the State reservation without making any deduction or allowance for supposed benefits.
3. Gloat Island and Prospect Park. The appraisal of these two parcels has been attended with peculiar difficulty. They are both what may be termed unique parcels. There is no other property like them. Their value cannot be estimated by ascertaining what similar pieces of property in that vicinity have been sold for, because there are no similar pieces of pi’operty. Opinions of witnesses as to value are usually confined to market value, and as there is no market value to these parcels, opinions are valuable only as they are based on some facts, from which, as made known in the evidence, it is the duty of the commissioners to draw their own conclusions. Groat Island (and in using this term we include therewith all the adjacent or appertaining islands—Luna, and the Three Sisters, and others), contains some sixty-two acres. These islands are in their natural state, and considered without reference to income, far the most valuable piece of property propose to be taken. They command the greatest variety of beautiful and magnificent views of the Falls and the Bapids. In exten t they are much greater than Prospect Park. They are absolutely necessary to a State reservation at Niagara, for a reservation, or park, not including these islands, would do little towards satisfying the desire of the public for a park, which will give to the people of the world free access to the objects of admiration and wonder at Niagara.
In estimating the value of these properties several considerations have been presented to us :
(1.) Appeal has been made to sentimental considerations. Counsel have been eloquent with reference to the beauties of Niagara Falls. They have spoken in fitting terms of the far-sounding roar of the cataract. the magnificence of the clouds of spray rising from its base, the rushing of the rapids, the splendor of the rainbows, and the general grandeur and beauty of the natural scenery visible from the islands and from Prospect Park. The tumultuous sound of the waters has been well likened to the “ voice of God,” and it was asserted that there was a certain dignity in the ownership of this property, amounting to almost a patent of nobility; and for this it was claimed that due compensation should be made. Considerations of this kind can have very little weight with us. The question involved is not poetical but eminently practical. The claimants, though they own the land under grants from the State of New Y ork, have no title to the rushing waters ; they do not own the pillars of spray that rise from the foot of the cataract, nor have they any title to the rainbow to be seen from Luna Island; we have held that they do not even own the bed of the river. The State of New York never owned and could not grant the running water, the spray, or the rainbow, or the roar of the cataract. These are not subject to human proprietorship ; they are the gift of God to the human race, and no one claiming under a grant from the State of New York can arrogate to himself any dignity or “patent of nobility” by reason of such ownership. These wonders of nature confess no human authority or control. What the present claimants have obtained under the grant from the State, is a legal right to exclude others from certain standpoints where they might view these impressive sights, and this right is subject to the power of the State, in the exercise of its prerogative of eminent domain, to resume possession of these lands, so as to restore to mankind the right freely, “ without money and without price,” to gaze upon these marvelous works of God. It is only for about three score years and ten, the limit of a single short human life, that the present proprietors or their ancestors have had any title to these lands. The wonder and beauties of the place were just as great for hundreds and thousands of years before the State of Hew York made its grants as they have been since. Augustus and Peter B. Porter and’ their descendants are unquestionably entitled to great credit for having preserved the primeval forest upon the islands, and for their not having permitted them to be desecrated by jDrofane hands. For this they should ever be held in grateful remembrance ; but for the supposed dignity of ownership we can certainly see no propriety in a pecuniary award.
(2.) We have considered somewhat the valuations heretofore practically put upon this property by the owners. In the absence of any evidence of market value this has seemed a necessary element in coming to a conclusion. It is unnecessary here to go into details on this subject. The highest price ever put upon the Goat Island property by its owners in the conveyance of undivided interests to each other has been about $410,000. An individual interest sold at public auction brought a much less proportionate value. In regard to Prospect Park the highest valuation that has ever before this appraisement been put upon it practically by the owners has been that at which the property was last capitalized, namely, $280,000. We have not, as our awards will show, considered these prices as controlling, but have given them some weight.
(8.) Opinions of witnesses in these cases, as already stated, not being based upon market value, have seemed to us valuable only in connection with the facts in evidence. The witnesses for the owners of the Goat Island property were one of the owners, Hr. Peter A. Porter, the Messrs. Symonds, who have for many years been agents of other owners of the property, and Mr. George W. Wright, who is a lessee and occupant of a portion of the property. These are all gentlemen of intelligence and character, but from interest and association prone to take a rose-colored view of the property. They based their opinions mainly upon their estimate of what the property could be made to produce, not upon the actual income derived from it. It seems to us that this is hardly a sufficient basis for the estimate they give, although it is not to be denied that the capabilities of property are to be taken into account. Such capabilities, however, must be shown by facts, and not rested upon mere conjecture. The actual net anual income of the Goat Island property has for several years past averaged about $15,000. The witnesses above referred to express the opinion that it might have been better managed ; that there have been circumstances which have prevented the use of the property for all it is worth, such as the infancy of one of the owners, and the fact that some of them were ladies who upon religious or sentimental grounds objected to the employment of such means as have been found advantageous in the case of Prospect Park. The witnesses called for the owners of Prospect Park, on the other hand, base their estimate on the actual receipts of the property for several years past, and upon the assumed fact that the net income will continue to be as much or more than it has been in the past.
(4.) The income of the premises. The general rule, as we understand it, is that while rental value may be considered in estimating actual value, the profits of a business transacted upon it are not legitimate evidence of such value. The reason of this is that many considerations enter into the profits of a business other than the intrinsic value of the real property. Lawyers in one office in New York city may be deriving an in come from their profession of $50,000 a year, while lawyers in adjoining rooms precisely similar are not earning one-tenth part of that sum. It would hardly be claimed that the rental value of the two suites of offices was in proportion to the income of the lawyers occupying them. The same comparison might be made as to adjoining stores occupied by merchants. The sagacity, ability, and economy of the merchant are large elements in determining the profits of his business. This principle, however, is not applicable to these properties to the same extent as it would be to law offices or stores or other places of ordinary business. The evidence of income in each case has been given without objection, and is before us, and we feel bound to consider and give it due weight. We are compelled to do this to some extent, by the absence of proof of market value which has been already referred to. We do not see how it can be omitted as an element in getting at the value of these properties. But before we can make the ascertained net income a measure of value we must be satisfied that it has the element of permanency, and that such income is derivable from the property itself, and not from the skill of the management of the property. The actual net annual income of Goat. Island is about $12,000. This is derived mainly from the charge for admission across tbe bridge to the island. It seems not to have derived many aids from skillful management or advertising. This sum would be the interest at 5 per cent, upon $800,000. We think this is an inadequate price, however, for the islands. We think that with reasonable diligence and skill the revenue from the islands themselves, considered as places for obtaining views of the natural scenery surrounding them and visible from them, might be considerably increased.
• But there are limits to the addition that can reasonably be made from this consideration. These islands were granted to Augustus Porter in 1816. That was before the time of railroads, although it was after the application of steam to the uses of locomotion upon water. The deed to Augustus Porter expresses no consideration except the payment of certain ;back taxes. How much these were is not shown, nor .are we informed what was actually paid for the grant. It' is fair to presume, however, that it was not a large sum, probably not one-hundredth part of the amount of our award. Suppose the legislature of 1817, con-winced of the folly of the grant of the year previous, .had enacted a law similar to that of 1883, for resuming possession, having had the sagacity to foresee that it was not for the advantage of the State that any individual should control the right of access to the scenery of the Falls, and that a commission had in that year been appointed to determine the compensation/to be paid to Augustus Porter. The Falls, and the Rapids, the spray and the rainbow, were quite as grand and 1 beautiful then, as now. Suppose some sagacious witness had been called who foresaw the immense strides in population and in the facilities of travel which this country has taken since that time, and had given as his opinion that in the course of sixty or seventy years by proper management the island might be made to produce to its owner a net income of some $10,000 to : $15,000 a year, and that in his honest opinion the property was worth $300,000. Can it be believed that .at that daté, such a proposition would have been listened to for a moment, or that it would not have met with universal ridicule, or that such a demand, made then by the owner, for a piece of property which had perhaps only cost him $1,000 the year before, would have been deemed so exorbitant as almost to be evidence of insanity % Now circumstances have changed. The actual annual net income has become about $15,000, and it may fairly be presumed that it will be somewhat increased. But we cannot assume that it will reach such proportions as to justify the high valuation claimed by the owners. Trying to give due weight to all these considerations, we have at last, after considerable difference of opinion and discussion, concluded to award for this property the sum of $525,000, which seems to us full compensation to the owners, and at the same time, in view of the situation and importance of the property to the State, not an extravagant price to be paid by the State therefor.
(5.) In regard to Prospect Park, the position is different. The actual income there is proved to have been larger than that of the Goat Island property. 'The average net annual income for eleven years since its organization is proved to have been over $16,000. For the last three it has been about $22,000. If this is tobe considered the assured permanent income of the property, the estimates of the witnesses on the part of the owners might not be considered very extravagant. But there are some elements of permanence lacking in this case. In order to continue to procure this net income, the receipts must be kept, up and the expenses kept down. It may readily be seen that neither of these events is certain. There are many things which may lessen the receipts, although perhaps the probabilities are in favor of their continuing or increasing ; but it seems to us that there will be very serious difficulties in keeping the expenses down. Two items seem to us of great importance in connection with this subject; first, the expense of management. It is evident that Mr. Townsend’s services had been invaluable to this company but he has not been paid for them. The fact that he and his wife own the great majority of the stock has undoubtedly made him willing to render his services without charge. It is conceded that the fair value of this property is the sum which a prudent man able to buy would be willing to pay for it. The prudent purchaser would see at once that he must have an equivalent to Mr. Townsend’s management, and that he would not be able to obtain such equivalent without paying a considerable salary. $2,000 a year would not seem to us extravagant to cover this expense. The second item is that of taxation. It appears in evidence that the taxes paid on the real estate have been from $1,000 to $1,200 a year. It does not appear what has been the assessed valuation of the property, or the rate of taxation. It is said by the learned counsel of the company, that as the law presumes assessors did their duty, it is to be presumed that they assessed this property at its full value, and that it has paid taxes thereon. This may be so in one sense, but there is certainly no presumption that the assessors valued this property at the price put upon if by the witnesses of the owners. It was their duty to assess it at its full value as estimated and decided by a majority of themselves. There is no presumption that the assessors were informed of its income, or tlfat they decided that it was worth a million of dollars or any like sum. The question is, what would a prudent purchaser estimate as the sum which he would have to pay by way of taxes upon a property claimed by its owners to be worth a million of dollars ? A very slight acquaintance with the rates of taxation throughout the State of New York would teach tlnv purchaser that, if his property was conceded to be worth a million, he would be very fortunate if he escaped with less than from $10,000 to $15,000 annual tax, instead of the $1,000 or $1,200 which the present owners have been fortunate enough' only to be required, to pay.
Thus it will be seen that the “prudent purchaser” might add from $13,000 to $18,000 at once to the annual expenses to which he was liable to be subjected, and thus the probable future net income be reduced by this amount. Again, he should take into consideration the fact that some portion of the income is derived from a ferry, which is operated without license from any authority in this State.
Still, it must be conceded that the property is a valuable one. It has for the last two years paid a dividend of seven per cent, upon a capital of $380,000. Before that it had paid a similar dividend upon a capital of $150,000. We have, therefore, in view of the financial prosperity of the company and the large income it has derived from the property, awarded to the owners a full and extremely liberal compensation, the sum of $335,000. In the case of both these properties we have awarded somewhat more than the highest estimate made by any witness called on the part of the State.
It seems unnecessary to comment upon any other of the awards which we have made, other than to say that we have endeavored, while-rejecting merely speculative values, to award to each owner full and liberal compensation for the property proposed to be taken.
Note on the Acquisition op Riparian Rights by Prescription.
In the case in the text, the Commissioners did-not pass upon the question whether the riparian owners on the shore of ilie Niagara River, or the owners of islands in the stream, could acquire by prescription as against the State, the right to use the water power.
Upon the negative of this question, the points and authorities found in the brief of Ansley Wilcox, Esq., of counsel for the State, are here condensed.
I. No prescriptive right can be acquired by riparian owners as against the State to use the power furnished by the rapids of the river, however long continued, or however valuable the improvements they may have made. The whole doctrine of prescription, aud the limitation of actions, is based upon theories of policy and not of justice. The question is one of mere right between the parties, not of expediency or justice. Canal Appraisers v. People, 17 Wend. 570, 606. The case of Crill v. City of Rome, 47 How. Pr. 398, fully sustains the above proposition, applying it to the Mohawk River, which was then no longer navigable in fact, though naturally a navigable stream. The case of Burbank v. Fay, 65 N. Y. 57, is a direct authority in our favor. See also Fort Plain Bridge Co. v. Smith, 30 N. Y. 44; Attorney-General v. Cohoes Co., 6 Paige, 133.
By the English law, prescription can be asserted of a purpresture but not of a nuisance. Gould on Waters, §§ 21, 22, 93, 93a, 167, 168, 212, 532. See Houck on Rivers, §§ 800-310; Angelí on Watercourses, §§ 554-561.
The rule in this country, and particularly in this State, is that any encroachment upon a strictly navigable and public stream is a public nuisance, whether it is a material hindrance to navigation or not. Wood on Nuisances, §§ 628-653. No right to continue a public nuisance can be obtained by prescription. Ib. §§ 710-746.
This doctrine is not based upon the impossibility of presuming a grant, since the State can legalize obstructions in navigable waters, subject only to the power of Congress to regulate interstate commerce. See Wood on Nuisances, § 628, et seq.; Houck on Rivers, chap. 7, especially § 209; Langdon v. Mayor of N. Y., 93 N. Y. 129; People v. N. Y. & S. I. Ferry Co., 68 N. Y. 71. The true basis of this doctrine is to be found in the proposition that every continuance of a public nuisance, is in itself a fresh erection of the nuisance in judgment of law. Wood on Nuisances, § 726; Renwick v. Morris, 7 Hill, 575; Brown v. Cayuga, &c. R. Co., 12 N. Y. 486; Conhocton Stone Co. v. B. N. Y. & E. R. Co., 52 Barb. 390; Vedder v. Vedder, 1 Denio, 257; Beckwith v. Griswold, 29 Barb. 291.
The following are all the cases in this State which have any bearing on this question: St. Vincent Orphan Asylum v. City of Troy, 76 N. Y. 108; Babcock v. Utter, 1 Abb. Ct. App. Dec. 27, 37; Jackson v. Babcock, 4 Johns. 418; Luce v. Carley, 24 Wend. 451; 1 Washb. on Real Prop. 400 n.; Walker v. Caywood, 31 N. Y. 51; 41 Penn. 270; Bliss v. Johnson, 94 N. Y. 235; Doe v. Thompson, 5 Cow. 371; Thompson v. Burhans, 79 N. Y. 93, 99; Mills v. Hall, 9 Wend. 315; Dygert v. Schenk, 23 Wend. 446; People v. Cunningham, 1 Denio, 524; Furman v. Mayor of N. Y., 5 Sandf. 16; Kellogg v. Thompson, 66 N. Y. 88; Rochester v. Erickson, 46 Barb. 92; Gillespie v. Forrest, 18 Hun, 110; Milhau v. Sharp, 27 N. Y. 611; Ogdensburgh v. Lovejoy, 2 T. & C. 83; afl’d in 58 N. Y. 662; Campbell v. Seaman, 2 Supm. Ct. (T. & C.) 231; aff’d in 63 N. Y. 568; Post v. Kreisher, 14 Abb. N. C. 38; s. c., 32 Hun, 49; People v. Vanderbilt, 26 N. Y. 287; 28 N. Y. 398; approved and followed in People v. N. Y. & S. I. F. Co., 68 N. Y. 71, 82; and see 38 Barb. 282; Commrs. of Pilots v. Clark, 33 N. Y. 251; Davis v. Mayor, &c. of N. Y., 14 N. Y. 506 ; Com. Dig. tit. Navigation, A. B.; Lansing v. Smith, 4 Wend. 9; Bellinger v. N. Y. C. & H. R. R. R. Co., 23 N. Y. 42; Hart v. Mayor, &c. of Albany, 3 Paige, 213; 9 Wend. 571; Moore v. Board of Commrs. of Pilots, 32 How. Pr. 184; Hecker v. N. Y. Bal. D. Co., 24 Barb. 215; s. c., 13 How. Pr. 549; Mayor, &c., of N. Y. v. Baumberger, 7 Robt. 219; Manhattan Gas Light Co. v. Barker, 7 Robt. 523; Blanchard v. W. U. Tel. Co., 60 N. Y. 510; D. H. Canal Co. v. Lawrence, 2 Hun, 163; aff’d in 56 N. Y. 602; Chenango Bridge Co. v. Paige, 83 N. Y. 178; Wetmore v. Atlantic White Lead Co., 37 Barb. 70; Peckham v. Henderson, 27 Barb. 207; Walker v. Caywood, 31 N. Y. 51; People v. Third Ave. R. R. Co., 45 Barb. 63.
The foregoing cases clearly establish certain distinctions: 1st. In the cases relating to obstructions in highways or rivers where the public does not own the fee, but only an easement of the passage, it is generally held that such obstructions do not amount to nuisances, unless they are practical and material interferences with the public right. 2nd. The cases relating to encroachment upon rivers and highways by persons claiming authority from the legislature are clearly distinguishable from the case at bar. So long as the authority has not been exceeded, no act under it can create a nuisance. 3rd. The dicta in some of the earlier cases which conflict with the proposition above stated, are based on .the English doctrine distinguishing a nuisance from a purpesture, which distinction does not now exist in this State. Furman v. Mayor, &c. of N. Y., 5 Sandf. 16; Wetmore v. Atlantic White Lead Co., 37 Barb. 70. 4th. There is a class of cases which hold absolutely that any encroachment upon a public river is, in New York, a purpresture, and per se, a nuisance, whether it be an actual interference with the public right of navigation or not. The leading case on this subject is People v. Vanderbilt, 38 Barb. 282; 26 N. Y. 287; which is followed in People v. N. Y. & S. I. Ferry Co , 68 N. Y. 71, supra; and the same principle is laid down in several of the cases above cited.
Taking this rule in connection with the doctrines laid down in Crill v. City of Rome (47 How.Pr. 398), and Burbank v. Fay (65 N. Y. 57), it appears to be clearly established that the land-owners at Niagara Falls cannot have established a prescriptive right to encroach upon the river bed, and use the water power as against the State. Whether this conclusion is based upon the theory that their acts have created a technical public nuisance, or upon the proposition that no private rights can be obtained in public waters by adverse user without regard to the doctrine of nuisances, makes no difference.
II. As to the proof necessary to establish a prescriptive right to use the water power of the Niagara River.
(а) The period of prescription is to be computed in analogy to the time fixed by the local statute of limitations as limiting the right of entry upon lands (Colvin v. Burnet, 17 Wend. 564, 567; Parker v. Foote, 19 Wend. 309; Miller v. Garlock, 8 Barb. 153; Hammond v. Zehner, 23 Barb. 473; Wood on Nuisances, § 701; 2 Washb. on Real Prop. [4th ed.] 318, 319, 322, 330 ; Vol. 3, Id. 52; Angelí on Watercourses, §§ 208, 209, 372, 375, note 4),and only the statutes as to limiting action by the people of the State apply since the State was originally the owner of the bed of the river and of the water power. People v. Denison, 17 Wend. 312; People v. Livingston, 8 Barb. 253; People v. Arnold, 4 N. Y. 508; People v. Trinity Church, 22 N. Y. 44.
Prior to 1830, the limitation of an action by the people for real estate was forty years (2 L. 1788, c. 43, § 1; 1 R. L. 1801, p. 562, c. 183; 1 R. L. 1813, p. 184, c. 183), and was then made twenty years, by the Revised Statutes (2 R. S. 392, §§ 1, 2;, which limitation continued in force until 1848, when the Code of Procedure (§ 75) changed the limitation to forty years, as it now remains (Code Civ. Pro. § 362).
The statute of limitations affects the lemedy only, and unless otherwise indicated by its terms, operates upon existing demands as well as upon those which arise in the future. Acker v. Acker, 81 N. Y. 143; Johnson v. Albany, &c. R. R. Co., 54 N. 7. 416. But it has been frequently held that neither of the statutes above referred to affects causes of action and.rights of entry upon land which existed before they took effect. Appleby v. Brown, 24 N. Y. 143; People v. Denison, 17 Wend. 312; Champlain & St. Lawrence R. R. Co. v. Valentine, 19 Barb. 481; Van Alen v. Feltz, 4 Abb. Ct. App. Dec. 439. See other cases cited in 4 Abb. N. Y. Dig. 245, 246.
It follows, first, that where the adverse use of water power began before January 1, 1830, it must be shown to have been continued for forty years uninterruptedly; second, that where such adverse use began after January 1, 1830, and before July 1, 1848, it must have continued twenty years; third, that where such use began since July 1, 1848, it must continue forty years. See Champlain & St. Lawrence R. R. Co. v. Valentine, 19 Barb. 484; La Frombois v. Jackson, 8 Cow. 589.
(б) The burden of proving a prescriptive right is upon the party asserting it. Wood on Nuisances, §§ 709, 710, 712; Gould on Waters, § 341; Hammond v. Zehner, 23 Barb. 473; Hart v. Mayor, &c. of Albany, 3 Paige, 213, 218; People v. N. Y. & S. I F. Co., 68 N. Y. 71, 77; cases cited in 4 Abb. N. Y. Dig. p. 247, par. 70; Hart v. Vose, 19 Wend. 365.
(c) The land-owners’ prescriptive right to use the water power must be measured strictly by the user, and not by the claim under which they were acting. Washb. on Real Prop. 4th ed. vol. 3, pp. 321, 322, 330, 331; vol. 3, p. 54; Wood on Nuisances, §§ 704, 710-712, 717; Miller v. Garlock, 8 Barb. 153; Stiles v. Hooker, 7 Cow. 266; Russell v. Scott, 9 Cow. 279; Rexford v. Marquis, 7 Lans. 249, 261, 263; Angell on Watercourses, §§ 224, 379; Corning v. Gould, 16 Wend. 529.
(d) The use must have been uninterrupted and continuous, Washb. on Real Prop. 4th ed. vol. 2, p. 326, et seg.; Gould on Waters, §§ 335, 336; Wood on Nuisances, §§ 703, 716, 719; Colvin v. Burnet, 17 Wend. 564; Miller v. Garlock, 8 Barb. 153; Parker v. Foote, 19 Wend. 309; Postlethwaite v. Payne, 8 Ind. 104; Stein v. Burden, 24 Ala. 130; 2 Washb. on Real Prop. 328; Campbell v. Seaman, 63 N. Y. 568, 585.
(e) And the use must have been clearly adverse,—that is, an actual interference with the rights of the State and not under its permission. Townsend v. McDonald, 12 N. Y. 381; Flora v. Carbean, 38 N. Y. 111; 2 Washb. on Real Prop. 322, and cases cited; Wood on Nuisances, §§ 712, n. 2, 716, 727; Angelí on Waters, § 219; Gould on Waters. § 339; Colvin v. Burnet, 17 Wend. 564.
(f) The use must be not only adverse to the interest of the owner of the servient tenement, but also acquiesced in by him, in order to give rise to a presumption of a grant and create a prescriptive right. 2 Washb. on Real Prop. § 326; Wood on Nuisances, § 715.
Lucius N. Bangs, Esq., on behalf of the Niagara Falls Paper Manuf. Co., on the other hand contended, that such right to use the water power could be and liad been acquired by prescription.
The only question is, has the adverse use continued for such length of time as to establish the presumption of a grant against the State ? The evidence discloses the fact that a paper-mill was constructed and operated as far back as 1884, upon the site of the present mill; and the statute of limitations, which was then twenty years, commenced running under that limitation and continued under that notwithstanding the change in the period of limitation made by the Revised Statutes in 1830. Champlain & St. Lawrence R. R. Co. v. Valentine, 19 Barb. 484. The contention that the occupancy of the stream was no obstruction in navigable waters, and therefore a nuisance which no length of time can legalize (Washb. on Easem. 480) is without force, because the river is permanently unnavigablc at-the point in question; and an erection in a navigable stream is not per se a nuisance, unless it is an interference with actual navigable uses. Regina v. Betts, 22 English L. Eq. 240, 246; Dutton v. Strong, 1 Black, 23. The burden of showing that the erection obstructs navigable waters lies with" the State in this case (Dutton v. Strong, supra), and the question must be determined by general and Axed laws and not arbitrarily. Yates v. Milwaukee, 10 Wall. 497.
This company is not guilty of erecting a nuisance unless such erection renders proper passage of bouts, etc., inconvenient or unsafe. Ex parte Jennings, 6 Cow. 518; Chenango Bridge Co. v. Paige, 83 N. Y. 178, 185. See the opinion of Senator Beardsley in Canal Appraisers v. People, 17 Wend. 570,606. It is not necessarily a nuisance to erect an obstruction in a stream used to a limited extent for transportation, as for floating logs and such like uses. Lancey v. Clifford, 54 Maine, 487; Morgan v. King, 35 N. Y. 454; Ledyard v. Ten Eyck, 36 Barb. 102; 1 R. S. 7th ed. 573, § 67.
The immediate and continued use by this company of the water for manufacturing purposes, is to be considered in construing the grant, if the language thereof is in any way questionable. Jackson v. Wood, 13 Johns. 346; Owen v. Bartholomew, 9 Pick. 520; Chad v. Tilsed, 2 Brod. & B. 403, 406.

 In Hensler v. Hartman (N. Y. Supreme Court, Fifth District; Before John G. Milburn, Esq., Referee, October, 1878), an action of ejectment for premises which plaintiff claimed as a part of the land described in a patent from the State of “ lot No. 87 of the unappropriated lands lying along the easterly side of the Niagara river, ” it was held that the plaintiff showed no title to the land in question, which it appeared was not a part of lot 87, but was a strip of made-land formed by filling in the river bed adjoining, of which it was held the State was the owner, and which did not pass by the patent which conveyed only to the river’s edge, because the river was both a navigable stream and a natural boundary between this country and a foreign nation.
That, assuming that the law of accretions applied to laud so formed, the ownership of the made-land vested in the State as the owner at the time of the filling in of the contiguous canal lands which it had acquired by appropriation of that part of lot 87 lying adjacent to the river for the Erie canal ; that the right to accretion depends on actual contiguity. But,,that the title to the land in question was not governed by the law of accretion, as its formation was not imperceptible, which is the test which decides the rights of riparian owners to accretions.
That the rule that prior possession is sufficient for a recovery in ejectment as against a defendant who is a mere intruder without other proof of title, applies only whore the possession is of such a character that a presumption of title follows ; not where the facts attending the possession and its character are fatal to the presumption.
That proof that the plaintiff’s husband (whose rights plaintiff had acquired) had been in possession of the premises for seven teen years, having built a dock and operated a ferry therefrom until his death, when tiie defendant entered and commenced running the ferry, was not ground for an inference of title in him, but his occupancy of lands lying adjacent to a great public canal and extending into a great public river, and connected with the thoroughfare on the opposite side by a public bridge, must be regarded as permissive under the State, and not as possession under a claim of title as against the State and everyone else.
The facts are fully stated in the opinion of the referee.
*177 Milbukit, Referee.—This is an action of ejectment brought to recover the possession of certain premises lying on the bank of the Niagara River, in the county of Erie, described as the ferry lot.
The. plaintiff bases her claim, firstly, on a clear record title to the premises ; secondly, to a part of the premises on the possession of her husband, now dead, for a period of about seventeen years, three of his heirs having conveyed their interest to her.
These claims will be considered separately, as they present different questions.
The people of the State of New York, by letters patent, conveyed in the year 1838 to one John Foster, lot No. 87 of the unappropriated lands lying along the easterly side of the Niagara River. The plaintiffs asserts that the ferry lot in question is a part of this lot 87.
The southwesterly half of lot 87 was conveyed in 1834 to Lewis F. Allen. In 1848, the title of this half was vested through various mesne conveyances in Charles Hickox, Jonathan Gillett, Parker Handy and Martin B. Scott as tenants in common, and they, in 1853, by various deeds, defined their specific interests in the premises, at the same time conveying an undivided one-sixth part to one Nathan C. Winslow and an undivided one-twelfth part to Truman Handy. The plaintiff' holds under conveyances of the ferry lot specifically described from all these parties who are living, and the heirs of such of them as are dead, made in the year 1875. Whether these parties had any title or interest to convey to the plaintiff, and which passed by their deeds, depends upon the question whether the ferry lot is a part of “Lot 87 of the unappropriated lands lying along the easterly side of the Niagara River.”
This lot 87 is carefully described in the field-book referred to in the original patent to Foster. The original lot, as appears by the field-book, was bounded by the river, and it extended back to a line known as “ The Mile Line.” The Erie Canal crosses this lot 87. At its original construction, sometime about the year 1830, the canal at this point was built partly in the river and partly within the portion of lot 87 lying adjacent to the river. The tow-path of the canal along this part was built entirely in the river. The berme bank was therefore on the land side, and must have been built on lot 87, a strip of the lot adjacent to the river along its entire river boundary being *178 appropriated to this purpose. The premises in question were not in existence then.
The Erie Canal was enlarged in the year 1853, or about that time. Along lot 87, it was enlarged entirely on the land side, and in this place the original tow-path of the canal was turned into the berme bank. The dirt excavated in enlarging the canal was thrown over this berme bank into the river. The accumulation of this dirt made the river where it was thrown more shallow, and, seemingly, at the point where the present ferry lot is, formed a strip of made-land extending outward from the berme bank. The plaintiff's husband, in the year 1855 or 1856, availed himself of this made-land, extended it further into the river by driving piles and filling in the intermediate space with stone and dirt, and in this way the ferry lot in question came-into existence.
The plaintiff, to avail herself of the record title in evidence, claims that the moment the ferry lot came into existence it formed a part of ‘ Lot 87 of the unappropriated lands lying along the easterly side of Niagara River,” and that the title thereto was vested in her by the deeds from Hickox and others,
I do not think that this position of the plaintiff's is tenable. In the first place, the premises in question, being reclaimed from the bed of the Niagara River,were not part of the river’s bed, the title to which was and is in the State, and did not pass by the patent.
No proof was made of the navigability of Niagara river, but I think that judicial notice may be taken of the fact.* See Brown v. Scofield, 8 Barbb. 239 ; People v. Allen, 42 N. Y. 378 ; People v. Canal Appraisers, 33 Id. 461. Especially is this so, in view of the legislation of the State in regard to navigable waters, the river Niagara being specially included. Laws of 1837, cb. 153. And the Niagara is frequently referred to in the judicial reports of this State as an acknowledged public stream. Canal Appraisers v. People, 17 Wend. 570, 623 ; People v. Gutchess, 48 Barb. 656, 666 ; Canal Comm'rs v. People, 5 Wend. 423, 462. Being navigable in fact, it follows that the State is the owner of the bed of the river. People v. Canal *179 Appraisers, 33 N. Y. 461. The operation of this rule in the construction of grants from the State, is to exclude the extension of a grant bounded generally on such a river to the center of the stream, and to limit it to the river’s edge.
An additional reason for a construction of the grant of lot 87 which will exclude the bed of the river, is the fact that the Niagara river is a natural boundary between this country and a foreign nation. Kingman v. Sparrow, 12 Barb. 201. See Art. 6, Treaty of Ghent, concluded Dec. 24, 1814, and the decision of commissioners under this article of June 13, 1822. The title to the center of the bed of the river did not, therefore, pass by the grant of the State to Foster.
In the next place, even if the law of accretion applies to land formed in this way, the ownership of it vested in the State as the owner of the contiguous canal lands, and not in the plaintiff’s grantors as owners of that part of lot 87 lying on the land side of the canal. It has been already stated that the Erie Canal, at the time of its original construction, was built along that part of lot 87, lying adjacent to the river. To prove the title of the State to the canal lands, various maps were introduced in evidence by the defendant, and admitted by consent as competent proof, though informally certified. These maps are declared by law to be presumptive evidence that the lands indicated on said maps as belonging to the State have been taken and appropriated by the State for canal purposes, provision being made for their proof in all judicial and legal proceedings. 1-R. 8. 218, §§ 4, 5, 6, 7; Laws of 1837, ch. 451, § 6. The map of the condition of the canal up to the time of the enlargement shows that the outside canal lands of the State on the river side opposite lot 87 were contiguous to the river, and it is well settled that the State owns the lands appropriated for canal purposes in fee. Rexford v. Knight, 15 Barb. 627 ; 11 N. Y. (1 Kern.) 308 ; Higgins v. Reynolds, 31 N. Y. 151.
The right to accretions depends on actual contiguity which did not exist in regard to the land of the plaintiff’s grantors. The canal lands of the State were adjacent to the ferry lot, and the State as adjacent owner takes whatever interest in it may flow from its character as an accretion. " The lands of the plaintiff’s grantors being separated from the river's edge by the canal, they were notin any sense adjacent owners, and the plaintiff can derive no rights from them as such. Saulet v. Shepherd, 4 Wall. 502; Schools v. Risley, 10 Wall. 91; *180 Banks v. Ogden, 2 Wall. 57; see People ex rel. Banks v. Colgate, 67 N. Y. 512.
But the title to the ferry lot is not governed by the law of accretions. The formation of this land was not imperceptible, as the term is legally defined in this connection, and this is the test which decides the rights of riparian owners to accretions. Halsey v. McCormick, 18 N. Y. 147; Cook v. McClure, 58 Id. 437; County of St. Clair v. Lovingston, 23 Wall. 46. Even if the plaintiff’s grantors were adjacent owners at the time the ferry lot was made, they would not as such acquire any rights of ownership in land reclaimed by artificial means from the bed of the river. The State being owner of the river’s bed, the mere reclaiming of a portion of it by one without authority or right, whether an adjacent owner or not, will not divest the State of its ownership of the part reclaimed. Barney v. Keokuk, 94 U. S. (4 Otto) 324; Wetmore v. Brooklyn Gas Light Co., 42 N. Y. 384. Also other authorities hereinafter cited.
In no possible view of the case can the plaintiff maintain any right of ownership in the ferry lot as grantee of the owners of lot 87 who derive their title through the patent to Foster.
The second position of the plaintiff is based upon the possession of her husband, Emanuel Hensler, of the premises from the year 1855 or 1856 to his death in 1878, and conveyances to her by three of his heirs. It is claimed that this possession is sufficient to entitle her to recover in ejectment such parts of the ferry lot as have been conveyed to her by the heirs of Emanuel Hensler as against defendant’s lessor who admittedly entered without any claim of title.
Prior possession is sufficient for a recovery in ejectment as against a defendant who is a mere intruder without other proof of title. It is not necessary to quote authorities in support of this broad proposition. The question is whether it is applicable to the facts of this case.
An examination of the cases discloses the foundation of this rule and its limitations. When the plaintiff relies only on prior possession he prevails through being helped out by legal presumptions. Possession, unexplained, is evidence of title, and all that the cases hold is that it is sufficient evidence of title as against an intruder who may not avail himself of an outstanding title with which he is unconnected. The rule of evidence that possession is prima facie evidence of a seizin *181 in fee, is given this controlling effect in these cases, and this is the extent of the principle decided.
Its application depends entirely upon the character of the possession proved. If such that the presumption of title follows, ejectment will lie against an intruder. It is otherwise if the facts attending the possession and its character are fatal to the presumption. Smith v. Lorillard, 10 Johns. 338; Jackson v. Rightmyre, 16 Johns. 314; Whitney v. Wright, 15 Wend. 171, 172; Clute v. Voris, 31 Barb. 511; Thompson v. Burhans, 61 N. Y. 52; Doe v. Dyball, 3 C. & P. 610.
The point is clearly stated in Thompson v. Burhans, supra, where it is said by the court :
“In determining the seóond proposition we may assume, for the purpose of giving the plaintiff the full benefit of every fact proved by him, that the defendants entered upon the premises without pretense of right, as did the defendant in Jackson v. Harder, 4 Johns. 203, 211 (a fact not established); even then a stranger to the title would have no right to maintain ejectment against them. In such a case the pai'ty seeking to oust them must, if he relies upon prior possession alone as evidence of his title, prove, not by hearsay or other inadmissible evidence, but by evidence which, if objected to, is competent, a possession from which, a title may be inferred ; or, if he rely upon written evidence of his title, it must be preceded with such preliminary proof (if any be necessary) as will entitle the proof offered to be read, and by one or the. other character of evidence, establish a prima facie title to the premises in controversy. ...... No case has gone so far as to hold that a parly in possession, however wrongful, can be compelled to surrender it to another who cannot produce at least competent prima facie evidence of his title to what he claims
Support is given to this position by the provisions of our statutory law in regard to the action of ejectment. 2 R. S. 302, tit. 1. The plaintiff in ejectment is required now to state in his complaint whether he claims in fee, or for the life of another, or for a term of years. 2 R. S. 304, § 10. The verdict is also to specify the estate proved at the trial by the plaintiff. 2 R. S. 307, § 30, sub. 7. These and other provisions of the title clearly restrict the action of ejectment to those who have some sort of a title to the premises in question, or a right of possession derived under such a title. See Cagger v. Lansing, 64 N. Y. 417, 428.
The question on which this case turns is narrowed down to this : *182 Has the plaintiff established such a possession of the ferry lot as is in law prima facie evidence of title thereto ? This question is entirely independent of the other, as to who has the actual title. If, from the possession proved, title may be inferred, it is competent evidence of title as against the defendant, who is in without any claim of title, and the plaintiff must prevail, though the evidence discloses that the title is actually in a third party.
A further statement of facts is necessary to show the character of the possession of the plaintiff’s husband.
At the ferry lot in question there are two bridges which span the canal. One of them, known as the tow-path bridge, was built where it is now shortly after the enlargement of the canal, and is used for canal purposes. When this bridge was built, the retaining wall marked on the map “Exhibit I,” was also built in the place indicated on the map, thus extending the berme bank beyond its ordinary width to allow the horses- used on the canal to cross from one side to the other and turn round, the tow-path at this point changing to the river side of the canal. This tow-path bridge had been previously further down the canal, and a ferry had run to if there for some time. After its removal, Hensler built the ferry landing about where it is now, and a roadway from below the abutment of the bridge to the landing. This roadway led to the bridge, which was used by the public for access to the ferry up to the time of the building of the public bridge in 1873 by the State. As the plaintiff testifies, “the land between the terminus of the bridge (referring to the tow-path bridge), and the ferry dock, has been used by the public going to and from the ferry.” But for the dock and the piling around it, the river would wash right in to the berme bank of the canal. After building the dock, Hensler, by his tenants, continuously ran the ferry until a short time before his death in 1873. During this time he, or his tenants for him, made such repairs on the dock as were necessary for its use as a landing. Within a month or two after his death, the defendant’s lessor, Ransom, entered upon the premises and commenced running a ferry. At this time there was no ferry in operation, and the landing was washed out to a considerable extent. Ransom rebuilt the dock, drove the piling, and laid necessary timbers. The State filled up the space between the piling and the berme bank, and graded the roadway to the bridge. What the State did was done by the authority of the proper canal officials. The State has done similar work every *183 year since. The landing formed in this way is a protection to the berme bank of the canal.
On these facts I must hold that the interest of the plaintiff in this ferry lot is not such as to allow her to maintain ejectment. The facts proved are decisive against such a possession being deemed in law any evidence of title.
This landing, lying adjacent to a great public canal and extending into a public river, and connected with the thoroughfare on the opposite side of the canal by a public bridge, is beyond question public property, and the occupancy of the plaintiff’s husband can only be regarded as permissive under the State, and not such as in time could ripen into a perfect title. A public convenience is served by the ferry, and the State may allow the erection and use of the ferry landing by private individuals, who are rewarded by the operation of the ferry, without conferring any interest upon the occupant that is not determinable, in the absence of a written agreement conferring aright of possession for a definite period, at the will of the State. The occupancy of the plaintiff’s husband must be referred to such a permission, rather than be treated as a possession under a claim of title as against the State and everyone else. Hart v. Vose, 19 Wend. 365; Kingman v. Sparrow, 12 Barb. 201; Thomas v. Marshfield, 13 Pick. 240; Parish of Medford v. Pratt, 4 Id. 221; Patten v. Elevated R. R. Co., 3 Abb. N. C. 306, 323, 324, 343, 344; see Thompson v. Mayor, etc. of N. Y., 11 N. Y. 115; Burbank v. Fay, 65 Id. 57.
The dock and landing made by the plaintiff’s husband were not an appropriation of public property which could give the plaintiff’s , husband any right as against the State. It is under the decisions and the facts of this case a purpreslure, and entiiely under the control of the State. That power could authorize its removal at any time. As long as the plaintiff’s husband was permitted to use and occupy it for ferry purposes, no outsider had a right to object or interfere with his possession. When the plaintiff’s husband'died, the defendant’s lessor took possession, and is apparently enjoying the property under the same tacit permission from the State that the plaintiff’s husband had. But such permissive occupancy conferred no such right or interest in the loous in quo as would entitle him in case of an ouster to maintain ejectment. There is the same fatal objection to the plaintiff’s case. She may be reinstated in possession by the State at any time, but her husband had no such estate in the premises as *184 was descendible to his heirs, and the plaintiff, as the grantee of a portion of them, has no such interest or estate as will support ejectment even against an intruder. Atty. Gen. v. Richards, 2 Anstruther, 603; Respublica v. Caldwell, 1 Dallas, 150; People v. Vanderbilt, 26 N. Y. 287, 292, 293, 297; Moore v. Board of Commissioners of Pilots, 32 How. Pr. 184; Delaware & II. Canal Co. v. Lawrence, 2 Hun, 163; Wetmore v. Brooklyn Gas Light Co., 42 N. Y. 384; People v. N. Y. & S. I. Ferry Co., 7 Hun, 105; 68 N. Y. 71; Naglee v. Ingersoll, 7 Pa. St. 184. See Poor v. McClure, 77 Id. 214; Tracy v. N. & W. R. R. Co., 39 Conn. 382.
There being no evidence of any title in the plaintiff, the defendant must have judgment.

 On this point see Wood v. Fowler, 26 Kans. 682; People v. Gold Run Ditch & Mining Co. (Cal. 1884), 4 Pac. Rep. 1152.
As to what are navigable rivers, see 58 Am. Dec. 49, 53.

The decision of the referee was confirmed by the special term, and no appeal was taken.

The cases upon the subject of riparian rights in non-navi gable waters are collated and considered in an article by Arthur Biddle, Esq., in American Law Register, June, 1880.